[No. S036384. Dec. 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL HANSEN, Defendant and Appellant.

304

**COUNSEL**

Joan T. Anyon, under appointment by the Supreme Court, and E. Stephen Temko for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Willliamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Howard Wayne, Keith I. Motley, Holly D. Wilkens and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—In this case we must determine whether the offense of discharging a firearm at an inhabited dwelling house (Pen. Code, § 246)[1] is a felony "inherently dangerous to human life" for purposes of the second degree felony-murder doctrine, and, if so, whether that doctrine nonetheless is inapplicable in the present case under the so-called "merger" doctrine applied in *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] and its progeny. For the reasons explained hereafter, we conclude that this offense, for such purposes, is a felony inherently dangerous to human life and does not "merge" with a resulting homicide so as to preclude application of the felony-murder doctrine. Because the Court of Appeal reached a similar conclusion, we affirm the judgment of that court upholding defendant's conviction of second degree murder.

---

[1]All further references are to the Penal Code unless otherwise indicated.

I

On September 19, 1991, defendant Michael Hansen, together with Rudolfo Andrade and Alexander Maycott, planned to purchase $40 worth of methamphetamine. With that purpose, defendant, accompanied by his girlfriend Kimberly Geldon and Maycott, drove in defendant's Camaro to an apartment duplex located in the City of San Diego. Upon arriving at the duplex, defendant pounded on the door of the upstairs apartment where Christina Almenar resided with her two children. When he received no response, defendant proceeded to return to his automobile and was approached by Michael Echaves.

Echaves resided in the downstairs apartment with Martha Almenar (Christina's sister) and Martha's two children, Diane Rosalez, thirteen years of age, and Louie Miranda, five years of age. At the time, Diane and Louie were outside with Echaves helping him with yard work. In response to a question from Echaves, defendant said he was looking for Christina. When Echaves stated he had not seen her, defendant asked whether Echaves would be able to obtain some crystal methamphetamine (speed). After making a telephone call, Echaves informed defendant that he would be able to do so. Defendant said he would attempt to purchase the drug elsewhere but, if unsuccessful, would return.

Defendant and his companions departed but returned approximately 20 minutes later. Defendant, accompanied by Echaves, Maycott, and Geldon, then drove a short distance to another apartment complex. Defendant parked his vehicle, gave Echaves two $20 bills, and told Echaves he would wait while Echaves obtained the methamphetamine. Echaves said he would be back shortly.

When Echaves failed to return, defendant and his companions proceeded to Echaves's apartment. Defendant knocked on the door and the windows. Diane and Louie were inside the apartment alone but did not respond. Their mother, Martha, had left the apartment to meet Echaves, who had telephoned her after eluding defendant. After meeting Echaves at a hardware store, Martha telephoned her children from a public telephone booth. Diane answered and told her mother that the "guys in the Camaro" had returned, pounded on the door, and then had left.

Meanwhile, defendant, Maycott, and Geldon returned to the location where Andrade was waiting for them, acquiring en route a handgun from an acquaintance. The three men then decided to return to Echaves's apartment with the objective either of recovering their money or physically assaulting

Echaves. At approximately 7:30 p.m., defendant approached the apartment building in his automobile with the lights turned off, and then from the vehicle fired the handgun repeatedly at the dwelling. At the time, Diane was inside the apartment, in the living room with her brother. The kitchen and living room lights were on. Diane was struck fatally in the head by one of the bullets fired by defendant.

On the basis of information furnished by witnesses to the shooting, the police were able to trace to defendant the vehicle from which the shots had been fired. On September 20, at approximately 3 a.m., police officers arrested defendant at the room of a motel where he was staying. Searching the trunk of his Camaro, the police discovered a nine-millimeter semi-automatic handgun and an empty ammunition clip for the weapon.

Five bullet holes were found at the scene of the homicide inside the apartment. It later was determined that shell casings and three bullets recovered at that location had been fired from the handgun found inside the trunk of defendant's vehicle.

That same morning, at 7 a.m., defendant was advised of his *Miranda* rights (*Miranda* v. *Arizona* (1965) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and waived them. He then confessed to having fired several shots from a handgun aimed at the apartment building. He stated that he had been waiting for someone whom he believed "took off with forty bucks" belonging to him, that he was shooting at "[j]ust the house," and that he would not have engaged in this conduct had he known "those kids were in there."

At trial, as part of the defense case, defendant testified that on the day of the shooting he had consumed a substantial quantity of alcohol and some crystal methamphetamine. He further testified that, when he initially returned to Echaves's apartment, he had observed the lights were on, but after knocking on the door and receiving no response, he believed no one was inside. He denied any recollection of actually having fired the shots at the apartment, although he remembered hearing "four or five loud noises," and denied having intended to harm anyone.

A neurologist and a neuropsychologist testified that defendant suffered from a mild prefrontal lobe injury that, in conjunction with the use of alcohol and drugs, could result in sudden, unplanned, and impulsive actions. A toxicologist testified regarding defendant's blood-alcohol level and its possible effects, based upon defendant's report as to the amount of alcohol he had consumed prior to the shooting. (His testimony did not refer to the

possible effect of defendant's use of crystal methamphetamine, as testified to by defendant.)

The trial court instructed the jury on several theories of murder, including second degree felony murder as an unlawful killing that occurs during the commission or attempted commission of a felony inherently dangerous to human life, and further instructed that the felony of shooting at an inhabited dwelling is inherently dangerous to human life. The jury returned a verdict finding defendant guilty of second degree murder (without specifying the theory upon which the conviction was based), and found true the allegation that he personally used a firearm during the commission of that offense (§ 12022.5, subd. (a)). The jury also found defendant guilty of discharging a firearm at an inhabited dwelling. At sentencing, the trial court imposed a term of imprisonment of 15 years to life for the second degree murder conviction, plus a consecutive term of 4 years for the personal-use-of-a-firearm enhancement. The court also imposed a term of five years for the offense of shooting at an inhabited dwelling, but stayed the sentence for that offense pursuant to section 654.

On appeal, defendant asserted, among other contentions, that the trial court erred in instructing the jury on second degree felony murder based upon the underlying felony of discharging a firearm at an inhabited dwelling, because the latter offense merged with the resulting homicide within the meaning of *People* v. *Ireland, supra,* 70 Cal.2d 522. Defendant relied upon *People* v. *Wesley* (1970) 10 Cal.App.3d 902, 905-910 [89 Cal.Rptr. 377], a decision holding that the offense proscribed by section 246 was an integral part of the resulting homicide and therefore could not support a second degree felony-murder conviction. Defendant also asserted as error the imposition of the firearm-use enhancement. Concluding the underlying felony proscribed by section 246 did not merge with the homicide, the Court of Appeal affirmed the conviction of second degree murder but struck the section 12022.5 firearm-use enhancement.

II

Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. ■ (§ 187, subd. (a).) Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].)

■ Malice may be express or implied. (§ 188.) It is express "when there is manifested a deliberate intention unlawfully to take away the life of a

fellow creature." (§ 188.) It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) We have held that implied malice has both a physical and a mental component, the physical component being the performance of " 'an act, the natural consequences of which are dangerous to life,' " and the mental component being the requirement that the defendant " ' knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " (*People* v. *Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549]; *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].)

█ The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life. "Under well-settled principles of criminal liability a person who kills—whether or not he is engaged in an independent felony at the time—is guilty of murder *if he acts with malice aforethought*. The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." (*People* v. *Satchell* (1971) 6 Cal.3d 28, 43 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383], cited by *People* v. *Patterson*, *supra*, 49 Cal. 3d 615, 626.)

The felony-murder rule applies to both first and second degree murder. Application of the first degree felony-murder rule is invoked by the perpetration of one of the felonies enumerated in section 189. In *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892], the court restricted the felonies that could support a conviction of second degree murder, based upon a felony-murder theory, to those felonies that are "inherently dangerous to human life." We have explained that the justification for the imputation of implied malice under these circumstances is that, "when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life . . . ." (*People* v. *Patterson*, *supra*, 49 Cal.3d at p. 626.) We also have reasoned that, " '[i]f the felony is not inherently dangerous, it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony.' " (*People* v. *Burroughs* (1984) 35 Cal.3d 824, 829 [201 Cal.Rptr. 319, 678 P.2d 894].) Thus, under the latter circumstances the commission of the felony could not serve logically as the basis for imputation of malice. (See *People* v. *Henderson* (1977) 19 Cal.3d 86, 93-94 [137 Cal.Rptr. 1, 560 P.2d 1180].)

In determining whether a felony is inherently dangerous, the court looks to the elements of the felony *in the abstract*, "not the 'particular' facts of the case," i.e., not to the defendant's specific conduct. (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647].)

Past decisions of this court have explained further the concept of an inherently dangerous felony. In *People* v. *Burroughs, supra,* 35 Cal.3d 824, 833, we held that an inherently dangerous felony is one which, "by its very nature, . . . cannot be committed without creating a substantial risk that someone will be killed . . . ." And, most recently, in *People* v. *Patterson, supra,* 49 Cal.3d 615, we specified that, "for purposes of the second degree felony-murder doctrine, an 'inherently dangerous felony' is an offense carrying 'a high probability' that death will result." (*Id.,* at p. 627.)

Felonies that have been found inherently dangerous to human life, in the abstract—thus supporting application of the second degree felony-murder rule—include furnishing a poisonous substance (methyl alcohol) (*People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193]), reckless or malicious possession of a destructive device (*People* v. *Morse* (1992) 2 Cal.App.4th 620, 646 [3 Cal.Rptr.2d 343]), and kidnapping for ransom (*People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1225 [277 Cal.Rptr. 382]).

■ The initial question presented in the case before us is whether the underlying felony involved—willful discharge of a firearm at an inhabited dwelling—is an inherently dangerous felony for purposes of the second degree felony-murder rule. The offense in question is defined in section 246, which provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house . . . is guilty of a felony . . . . [¶] As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."[2] As we shall explain, we conclude that this felony, considered in the abstract, involves a high probability that death will result and therefore is an inherently dangerous felony under the governing principles set forth above, for purposes of the second degree felony-murder doctrine.

Although our court has not had occasion previously to render a direct holding on the question whether the offense proscribed by section 246 is an

---

[2]Section 246 provides in full: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, as defined in Section 362 of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for three, five, or seven years, or by imprisonment in the county jail for a term of not less than six months and not exceeding one year. [¶] As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

inherently dangerous felony for purposes of the second degree felony-murder doctrine, the reasoning and language of one of our prior decisions—*People v. Satchell, supra,* 6 Cal.3d 28—provide a rather clear indication of this court's view on this issue. In *Satchell,* the court held the felony of possession of a concealable firearm by a felon (§ 12021), considered in the abstract, was not inherently dangerous to human life and therefore would not support an instruction on second degree felony murder. The court concluded that "mere passive possession" of a firearm, even by a felon, could not properly supply the element of malice in a murder prosecution. (6 Cal.3d at p. 42.) The court went on to say, however, that if passive possession ripened into a felonious act in which danger to human life was inherent, the purposes of the felony-murder rule would be served by its application, because "it is the deterrence of such acts by felons which the rule is designed to accomplish." (6 Cal.3d at p. 43.) The court noted that a "ready example" of such a felony was the act proscribed by section 246, discharging a firearm at an inhabited dwelling. (6 Cal.3d at p. 43, fn. 22.)

Although the pertinent language in *Satchell* clearly was dictum, the reasoning underlying this language remains sound following our decision in *People v. Patterson, supra,* 49 Cal.3d 615. The discharge of a firearm at an inhabited dwelling house—by definition, a dwelling "currently being used for dwelling purposes, whether occupied or not" (§ 246)—is a felony whose commission inherently involves a danger to human life. An inhabited dwelling house is one in which persons reside (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1018 [232 Cal.Rptr. 132, 728 P.2d 202]) and where occupants "are generally *in* or *around* the premises." (*People v. White* (1992) 4 Cal.App.4th 1299, 1303 [6 Cal.Rptr.2d 259], italics in original.) In firing a gun at such a structure, there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent (*People v. Rodriguez, supra,* 42 Cal.3d at p. 1018), the offense nonetheless is one that, viewed in the abstract—as shooting at a structure that currently is used for dwelling purposes—poses a great risk or "high probability" of death within the meaning of *Patterson.* The nature of the other acts proscribed by section 246 reinforces the conclusion that the Legislature viewed the offense of discharging a firearm at an *inhabited dwelling* as posing a risk of death comparable to that involved in shooting at an *occupied* building or motor vehicle.

Furthermore, application of the second degree felony-murder rule to a homicide resulting from a violation of section 246 directly would serve the fundamental rationale of the felony-murder rule—the deterrence of negligent or accidental killings in the course of the commission of dangerous felonies.

The tragic death of innocent and often random victims, both young and old, as the result of the discharge of firearms, has become an alarmingly common occurrence in our society—a phenomenon of enormous concern to the public. By providing notice to persons inclined to willfully discharge a firearm at an inhabited dwelling—even to those individuals who would do so merely to frighten or intimidate the occupants, or to "leave their calling card"—that such persons will be guilty of murder should their conduct result in the all-too-likely fatal injury of another, the felony-murder rule may serve to deter this type of reprehensible conduct, which has created a climate of fear for significant numbers of Californians even in the privacy of their own homes.

Accordingly, we hold that the offense of discharging a firearm at an inhabited dwelling is an "inherently dangerous felony" for purposes of the second degree felony-murder rule.

## III

Defendant contends that, even if the section 246 felony of discharging a firearm is inherently dangerous to human life, the commission of that felony in the present case "merged" with the resulting homicide, within the meaning of *People* v. *Ireland, supra,* 70 Cal.2d 522, thereby precluding application of the second degree felony-murder rule.

As we shall explain, defendant's contention rests upon an unduly expansive view of the scope of the "merger" doctrine applied in *Ireland.* Prior to our decision in *Ireland,* the "merger" doctrine had been developed in other jurisdictions as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or "predicate") felony committed by the defendant was *assault.* The name of the doctrine derived from the characterization of the assault as an offense that "merged" with the resulting homicide. In explaining the basis for the merger doctrine, courts and legal commentators reasoned that, because a homicide generally results from the commission of an assault, every felonious assault ending in death automatically would be elevated to murder in the event a felonious assault could serve as the predicate felony for purposes of the felony-murder doctrine. Consequently, application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults

that happened to result in death (those committed without malice afore-thought, and therefore punishable as manslaughter). (See Note, *The Doctrine of Merger in Felony-Murder and Misdemeanor-Manslaughter* (1960) 35 St. Johns L. Rev. 109, 117; see also Crump & Crump, *In Defense of the Felony Murder Doctrine* (1985) 8 Harv. J. L. & Pub. Pol'y. 359, 379; Note, *Application of the Merger Doctrine to the Felony Murder Rule in Texas: The Merger Muddle* (1990) 42 Baylor L. Rev. 535; *People* v. *Moran* (1927) 246 N.Y. 100 [158 N.E. 35, 36-37] (opn. of Cardozo, C. J.).) One commentator explains that the merger rule applied to assaults is supported by the policy of preserving some meaningful domain in which the Legislature's careful gradation of homicide offenses can be implemented. (Crump & Crump, *In Defense of the Felony Murder Doctrine, op. cit. supra*, 8 Harv. J. L. & Pub. Pol'y. 359, 379.)

In *People* v. *Ireland, supra*, 70 Cal.2d 522, we adopted the merger rule in a case involving the underlying felony of assault with a deadly weapon, where the defendant had shot and killed his wife. The jury was instructed that it could return a second degree felony-murder verdict based upon the underlying felony of assault with a deadly weapon, and the defendant was convicted of second degree murder.

On appeal, this court reversed, reasoning that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (70 Cal.2d at p. 539.) The court therefore concluded that the offense of assault with a deadly weapon, which was "an integral part of" and "included *in fact*" within the homicide, could not support a second degree felony-murder instruction. (*Ibid.*)

Subsequent decisions have applied the *Ireland* rule to other felonies involving assault or assault with a deadly weapon. (See *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886] [felony child abuse of the assaultive category]; *People* v. *Wilson* (1969) 1 Cal.3d 431, 440 [82 Cal.Rptr. 494, 462 P.2d 22] [burglary with intent to commit the felony of assault with a deadly weapon]; *People* v. *Landry* (1989) 212 Cal.App.3d 1428, 1437-1439 [261 Cal.Rptr. 254] [assault with a deadly weapon].)

Our court, however, has not extended the *Ireland* doctrine beyond the context of assault, even under circumstances in which the underlying felony plausibly could be characterized as "an integral part of" and "included in fact within" the resulting homicide. The decision in *People* v. *Mattison, supra*, 4

Cal.3d 177, provides an apt example. In that case, the defendant and the victim both were inmates of a correctional institution. The defendant worked as a technician in the medical laboratory. He previously had offered to sell alcohol to inmates, leading the victim, an alcoholic, to seek alcohol from him. The defendant supplied the victim with methyl alcohol, resulting in the victim's death by methyl alcohol poisoning.

At trial, the court instructed on felony murder based upon the felony of mixing poison with a beverage, an offense proscribed by the then current version of section 347 (" 'Every person who wilfully mingles any poison with any food, drink or medicine, with intent that the same shall be taken by any human being to his injury, is guilty of a felony.' ") (4 Cal.3d at p. 184.) The defendant was convicted of second degree murder. On appeal, contending that the trial court had erred in instructing the jury on felony murder, the defendant maintained that, on the facts of his case, the underlying felony (§ 347) was "an integral part of" and "included in fact within" the resulting murder, precluding application of the felony-murder rule. (4 Cal.3d at p. 185.)

In *Mattison, supra,* 4 Cal.3d 177, in rejecting the defendant's contention and affirming his second degree murder conviction, we found that the predicate felony (§ 347) presented an "entirely different situation from the one that confronted us in *Ireland*," where the underlying felony was assault with a deadly weapon. (4 Cal.3d at p. 185.) We concluded that the merger rule was inapplicable because, in furnishing the methyl alcohol to the victim, the defendant exhibited a *collateral and independent felonious design* that was separate from the resulting homicide. Adopting the rule and reasoning articulated in *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697], we held that where the underlying felony is committed with a design collateral to, or independent of, an intent to cause injury that would result in death, "[g]iving a felony-murder instruction in such a situation serves rather than subverts the purpose of the rule." (4 Cal.3d at p. 185.)

The Court of Appeal's decision in *People* v. *Taylor, supra,* 11 Cal.App.3d 57, upon which *Mattison* explicitly relied, provides additional guidance concerning the rationale of our decision in *Mattison.* In *Taylor,* the victim died as a result of an overdose of heroin, which had been furnished to her by the defendant. The defendant was convicted of second degree murder, and the question presented was whether application of the felony-murder rule constituted error under *Ireland.* The Court of Appeal in *Taylor* first acknowledged the confusion that arose from the circumstance that, although *Ireland* involved an assault with a deadly weapon (a felony to which the merger rule traditionally has been applied), the broad language of *Ireland* could be

interpreted as extending that rule to all felonies that constitute "an integral part of the homicide," potentially encompassing all felonies closely related to a homicide (and therefore possibly every felony inherently dangerous to human life). (*Id.*, at p. 60.) To clarify the ambiguity created by *Ireland*, the Court of Appeal in *Taylor* sought to pinpoint the precise rationale of the rule in *Ireland*, in the process reviewing the New York decisions, cited by the court in *Ireland*, that had applied the merger doctrine. (*Id.*, at pp. 60-61.)

After analyzing New York decisional law, and concluding that *Ireland*'s "integral part of the homicide" language did not constitute the crucial test in determining the existence of merger, the court in *Taylor* held that a felony does not merge with a homicide where the act causing death was committed with a collateral and independent felonious design separate from the intent to inflict the injury that caused death. (11 Cal.App.3d at pp. 61, 63.) The court explained its reasoning as follows: when the Legislature has prescribed that an assault resulting in death constitutes second degree murder *if the felon acts with malice*, it would subvert the legislative intent for a court to apply the felony-murder rule automatically to elevate *all* felonious assaults resulting in death to second degree murder *even where the felon does not act with malice*. In other words, if the felony-murder rule were applied to felonious assaults, all such assaults ending in death would constitute murder, effectively eliminating the requirement of malice—a result clearly contrary to legislative intent. The court in *Taylor* further explained, however, that when the underlying or predicate felony is not assault, but rather is a felony such as the furnishing of heroin involved in *Taylor*, application of the felony-murder rule would *not* subvert the legislative intent, because "this is simply not a situation where the Legislature has demanded a showing of actual malice, as distinguished from malice implied in law by way of the felony-murder rule." (*Id.*, at p. 63, fn. omitted.)

We agree with *Taylor*'s definition of the scope of the *Ireland* rule and its rejection of the premise that *Ireland*'s "integral part of the homicide" language constitutes the crucial test in determining the existence of merger. Such a test would be inconsistent with the underlying rule that only felonies "inherently dangerous to human life" are sufficiently indicative of a defendant's culpable mens rea to warrant application of the felony-murder rule. (See *People* v. *Satchell*, *supra*, 6 Cal.3d 28, 43.) The more dangerous the felony, the more likely it is that a death may result directly from the commission of the felony, but resort to the "integral part of the homicide" language would preclude application of the felony-murder rule for those felonies that are most likely to result in death and that are, consequently, the felonies as to which the felony-murder doctrine is most likely to act as a deterrent (because the perpetrator could foresee the great likelihood that death may result, negligently or accidentally).

We decline, however, to adopt as the critical test determinative of merger in all cases the following language that appears in *Taylor*, quoting a decision of a New York court: that the rationale for the merger doctrine does not encompass a felony " 'committed with a collateral and independent felonious design.' " (*People* v. *Taylor*, *supra*, 11 Cal.App.3d at p. 63; see also *People* v. *Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793].) Under such a test, a felon who acts with a purpose other than specifically to inflict injury upon someone—for example, with the intent to sell narcotics for financial gain, or to discharge a firearm at a building solely to intimidate the occupants—is subject to greater criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim. Rather than rely upon a somewhat artificial test that may lead to an anomalous result, we focus upon the principles and rationale underlying the foregoing language in *Taylor*, namely, that with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent.

In the present case, as in *Mattison* and *Taylor*, application of the second degree felony-murder rule would not result in the subversion of legislative intent. Most homicides do not result from violations of section 246, and thus, unlike the situation in *People* v. *Ireland*, *supra*, 70 Cal.2d 522, application of the felony-murder doctrine in the present context will not have the effect of "preclud[ing] the jury from considering the issue of malice aforethought . . . [in] the great majority of all homicides." (*Id.*, at p. 539.) Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought. As in *Taylor*, this is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged "maliciously and willfully") in order to support a second degree murder conviction. Indeed, as discussed above, application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrine—namely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies.

The Texas Court of Criminal Appeals recently applied similar reasoning in upholding a murder conviction that occurred after a jury was instructed on felony murder based upon underlying felonious conduct involving the discharge of a firearm into an occupied dwelling. (*Aguirre* v. *State* (Tex.Crim.App. 1987) 732 S.W.2d 320, 324-325 [opn. on rehg.].) The court

viewed the defendant's conduct of "attempting to blow open a door with a shotgun" as an offense that did not "merge" with the resulting homicide. (*Id.*, at p. 325.)

In rendering our decision in the present case, we disapprove of the holding in *People* v. *Wesley, supra,* 10 Cal.App.3d 902, in which the Court of Appeal, in construing *Ireland,* concluded that the felony proscribed by section 246 merged with a resulting homicide because the felony was in fact "an integral part" and a necessary element of the homicide. (10 Cal.App.3d at p. 907.) As is apparent from our earlier discussion in the present opinion, the appellate court's reliance in *Wesley* upon this particular language, as providing the crucial test in determining the existence of merger, was misplaced.

For the foregoing reasons, we conclude that the offense of discharging a firearm at an inhabited dwelling house does not "merge" with a resulting homicide within the meaning of the *Ireland* doctrine, and therefore that this offense will support a conviction of second degree felony murder. Accordingly, the trial court did not err in instructing the jury on a second degree felony-murder theory based upon the underlying felony of discharging a firearm at an inhabited dwelling house.

## IV

The Court of Appeal struck the four-year term of imprisonment imposed for the firearm-use enhancement (§ 12022.5, subd. (a)) on the ground that use of a firearm is an element of second degree felony murder when such murder is based upon the underlying felony of discharging a firearm at an inhabited dwelling (§ 246). The Court of Appeal reasoned that, although the jury returned a general verdict convicting defendant of second degree murder (without specifying the theory relied upon), the jury " found true all element[s] necessary for a conviction of murder based on the felony-murder," and firearm use was an essential element of the underlying felony of discharging a firearm at an inhabited dwelling.

■ The People contend the Court of Appeal erred in striking the firearm-use enhancement, because firearm use is not an essential component of the crime of second degree murder considered in the abstract.

We agree. The Court of Appeal erred in its construction of the limitation upon the application of the firearm-use enhancement, set forth in section 12022.5, subdivision (a), which at the time of sentencing provided in pertinent part: "[A]ny person who personally uses a firearm in the commission . . . of a felony shall, upon conviction of that felony . . . be punished

by an additional term of imprisonment in the state prison for three, four, or five years, unless use of a firearm *is an element of the offense of which he or she was convicted.*" (Italics added.)[3] The phrase "element of the offense" signifies an essential component of the legal definition of the crime, *considered in the abstract.* (*People* v. *Ross* (1994) 28 Cal.App.4th 1151, 1156 [33 Cal.Rptr.2d 894]; *People* v. *Zamora* (1991) 230 Cal.App.3d 1627, 1636 [282 Cal.Rptr. 100].) In the present case, the crime of which defendant was convicted was second degree murder. That offense, considered in the abstract, does not include use of a firearm as an element. Second degree murder may be committed in a myriad of ways, some that involve use of a firearm, and others, such as stabbing, poisoning, or strangling, that do not involve use of this type of weapon. Under section 12022.5, subdivision (a), the enhancement applies unless "use of a firearm is an element of the offense," and not merely the means by which the offense was committed or the factual predicate of a theory upon which the conviction was based. (See *People* v. *Ross, supra,* 28 Cal.App.4th at p. 1156; *People* v. *Quesada* (1980) 113 Cal.App.3d 533, 540 [169 Cal.Rptr. 881] ["The crime of manslaughter may be committed in many ways without a firearm; the fact that this particular crime was committed with use of a firearm does not make such use an 'essential element' of the offense."].) In decreeing that murder committed by use of a firearm should be punished more severely than murder committed without resort to such a weapon, the Legislature has not exempted those convictions in which the murder conviction rests upon the felony-murder rule.

For these reasons, the trial court did not err in imposing an additional four-year term of imprisonment for the firearm-use enhancement.

### V

The judgment of the Court of Appeal is reversed to the extent that it strikes the firearm-use enhancement, and in all other respects the judgment is affirmed.

Lucas, C. J., Arabian, J., and Baxter, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the judgment and in the reasoning of the majority on the question whether the offense of discharging a firearm at an inhabited dwelling in violation of Penal Code section 246 is an inherently dangerous felony for purposes of the second degree felony-murder rule. I write separately to express my understanding of the "merger" doctrine, as articulated in *People* v. *Ireland* (1969) 70 Cal.2d 522 [75

---

[3]As amended in 1994, section 12022.5, subdivision (a), provides for an additional term of imprisonment for three, four, or ten years. (Stats. 1994, First Ex. Sess. 1993-1994, ch. 33, § 6.)

Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] (*Ireland*) and succeeding decisions, and as applied here.

I join the majority in rejecting the premise *Ireland*'s "integral part of the homicide" language is decisive of the merger issue in this case. (Maj. opn., *ante*, at p. 314.) In my view, however, *People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193] (*Mattison*), adopting the reasoning of the Court of Appeal in *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697] (*Taylor*), sets forth the operative test. Those cases require us to determine whether the underlying felony was committed with a "collateral and independent felonious design." (*Mattison, supra,* 4 Cal.3d at p. 185; *Taylor, supra,* 11 Cal.App.3d at p. 61.) Unlike the majority, I see no reason not to follow those decisions. I do not share the majority's concern that application of the *Mattison* and *Taylor* rule leads to the anomalous result of punishing one who does not intend to injure more harshly than one who does. One who commits a felony inherently dangerous to human life with the intent to inflict injury is, in all probability, guilty of second degree murder under the implied malice theory. It follows there likely will be no disparity in the respective criminal liability of the two offenders; thus, the anomaly the majority fears is more apparent than real.

The evidence in this case supports the conclusion defendant entertained a collateral and independent felonious design under *Mattison* and *Taylor*, namely to intimidate Echaves by firing shots into his house. Accordingly, I join in the disposition this court's judgment will effect.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment to the extent that it affirms the judgment of the Court of Appeal affirming defendant's conviction of discharging a firearm at an inhabited dwelling house in violation of Penal Code section 246. This conviction was not affected by reversible error.

By contrast, I dissent from the judgment to the extent that it affirms the judgment of the Court of Appeal affirming defendant's conviction of murder in the second degree under Penal Code sections 187, 188, and 189. This conviction was affected by reversible error when the superior court instructed the jury on second degree felony murder based on discharge of a firearm at an inhabited dwelling house.

I also dissent from the judgment to the extent that it reverses the judgment of the Court of Appeal setting aside an enhancement of defendant's sentence for personal use of a firearm in the commission of murder in the second degree, *within the* meaning of Penal Code section 12022.5. This sentence

enhancement must be set aside as without legal predicate because defendant's second degree murder conviction, on which it depends, must itself be set aside.

I

Murder is defined by statute as "the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears; or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, § 188.)

Murder is of the first degree, pursuant to statute, when it consists of a murder, i.e., an unlawful killing with malice aforethought, that "is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing . . . ." (Pen. Code, § 189.)

Murder is also of the first degree, pursuant to statute, when it simply comprises an unlawful killing, even without malice aforethought, that "is committed in the perpetration of, or attempt to perpetrate," certain enumerated felonies. (Pen. Code, § 189; see generally, *People* v. *Dillon* (1983) 34 Cal.3d 441, 462-472 [194 Cal.Rptr. 390, 668 P.2d 697] (plur. opn. of Mosk, J.); accord, *id.* at p. 490 (conc. opn. of Kaus, J.).)

Murder is of the second degree, pursuant to statute, when it consists of any murder that is not of the first degree. (Pen. Code, § 189.)

Murder is also of the second degree, by judicial decision, when it simply comprises an unlawful killing, even without malice aforethought, that directly results from an unenumerated felony that is inherently dangerous to human life. (E.g., *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) In determining whether a felony is inherently dangerous to human life, "we look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647].) So viewed, a felony is inherently dangerous to human life if, and only if, it carries " 'a high probability' that death will result." (*People* v. *Patterson* (1989) 49 Cal.3d 615, 627 [262 Cal.Rptr. 195, 778 P.2d 549] (lead opn. of Kennard, J.); accord, *id.* at p. 640 (conc. & dis. opn. of Mosk, J.); *id.* at p. 641 (conc. & dis. opn. of Panelli, J.).)

At issue is the second degree felony-murder rule. This doctrine arises not from any statute enacted by the Legislature but rather from the common law made by the courts. "[T]he second degree felony-murder rule remains, as it has been since 1872, a judge-made doctrine without any express"—or implied—"basis in the Penal Code . . . ." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 472, fn. 19 (plur. opn. of Mosk, J.); accord, *id.* at p. 490 (conc. opn. of Kaus, J.) [*semble*]; *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829, fn. 3 [201 Cal.Rptr. 319, 678 P.2d 894].)[1] Contrary to the majority's assertion (maj. opn., *ante,* at p. 308), the rule does not "impute" the element of malice aforethought. Rather, it omits that element altogether. (See *People* v. *Patterson, supra,* 49 Cal.3d at p. 626 (lead opn. of Kennard, J.) [speaking of the second degree felony-murder rule as a "substitute" for malice aforethought]; see also *People* v. *Dillon, supra,* 34 Cal.3d at pp. 472-476 (plur. opn. of Mosk, J.) [expressing the same view as to the first degree felony-murder rule]; accord, *id.* at p. 490 (conc. opn. of Kaus, J.).)

The purpose of the second degree felony-murder rule is simply "to deter [persons] engaged in felonies from killing negligently or accidentally . . . ." (*People* v. *Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; accord, *People* v. *Smith* (1984) 35 Cal.3d 798, 807 [201 Cal.Rptr. 311, 678 P.2d 886].)[2] Contrary to the majority's implication at points (maj. opn., *ante,* at pp. 310, 314), the objective is *not* to deter such persons from committing the underlying felonies themselves (*People* v. *Smith, supra,* 35 Cal.3d at p. 807).

Pursuant to the so-called "merger" doctrine, the second degree felony-murder rule is not applicable when, on the evidence adduced at trial, the underlying felony was an "integral part" of, and "included *in fact*" within, the resulting homicide. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], italics in original.)[3]

A felony may be so characterized when "there was a single course of conduct with a single purpose," viz., to commit "the very assault which resulted in death . . . ." (*People* v. *Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793] [involving the first degree felony-murder rule];

---

[1] *People* v. *Landry* (1989) 212 Cal.App.3d 1428, 1434-1437 [261 Cal.Rptr. 254], is to the contrary. It founders on the authority and reasoning of *People* v. *Burroughs, supra,* 35 Cal.3d 824, and *People* v. *Dillon, supra,* 34 Cal.3d 441.

[2] This, of course, is the purpose of the felony-murder rule generally. (E.g., *People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].)

[3] The "merger" doctrine operates as to the felony-murder rule generally. (See, e.g., *People* v. *Wilson* (1969) 1 Cal.3d 431, 439-442 [82 Cal.Rptr. 494, 462 P.2d 22] [applying to the first degree felony-murder rule the reasoning of *People* v. *Ireland, supra,* 70 Cal.2d at p. 539, which deals specifically with the second degree felony-murder rule].)

accord, *People* v. *Smith, supra,* 35 Cal.3d at pp. 805-806 [involving the second degree felony-murder rule].) It has been held that assault is simply a willful act "likely to result in . . . physical force" against another. (*People* v. *Colantuono* (1994) 7 Cal.4th 206, 218 [26 Cal.Rptr.2d 908, 865 P.2d 704].)

A felony, however, cannot be so characterized when "there [was] an independent felonious purpose," such as to steal. (*People* v. *Burton, supra,* 6 Cal.3d at p. 387, italics omitted [involving the first degree felony-murder rule]; accord, *People* v. *Smith, supra,* 35 Cal.3d at pp. 805-806 [involving the second degree felony-murder rule]; see *People* v. *Taylor* (1970) 11 Cal.App.3d 57, 63 [89 Cal.Rptr. 697] (per Kaus, P. J.) [involving the second degree felony-murder rule: speaking of " 'collateral and independent felonious design' "]; *People* v. *Mattison* (1971) 4 Cal.3d 177, 185-186 [93 Cal.Rptr. 185, 481 P.2d 193] [involving the second degree felony-murder rule: quoting *Taylor*].)

At bottom, then, the "merger" doctrine is predicated on, and limited by, the following rationale. When a felony is undertaken with the purpose to engage in an assault, in the sense of a willful act "likely to result in . . . physical force" against another (*People* v. *Colantuono, supra,* 7 Cal.4th at p. 218), the second degree felony-murder rule cannot be invoked because its objective—to deter the perpetrator from killing *negligently* or *accidentally*—is not likely to be attained. (See, e.g., *People* v. *Smith, supra,* 35 Cal.3d at p. 807.) It "can hardly be much of a deterrent to a defendant who has decided" to so act. (*People* v. *Taylor, supra,* 11 Cal.App.3d at p. 63.) By contrast, when a felony is undertaken with a different purpose, the rule is allowed to operate because its objective can be reached. (Cf. *People* v. *Burton, supra,* 6 Cal.3d at pp. 387-388 [to such effect under the first degree felony-murder rule].)

II

At trial, the superior court instructed the jury on the crime of murder. As pertinent here, it stated:

"Every person who unlawfully kills a human being . . . during the commission or attempted commission of a felony inherently dangerous to human life is guilty of the crime of murder . . . .

"In order to prove such crime, each of the following elements must be proved: 1. A human being was killed, 2. The killing was unlawful, and 3. The killing . . . occurred during the commission or attempted commission of a felony inherently dangerous to human life. Shooting at an inhabited

dwelling is a felony inherently dangerous to human life." (Paragraphing omitted.)

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of shooting at an inhabited dwelling is murder of the second degree . . . ."

After six days of deliberations—almost as much time as was devoted to evidence, arguments, and instructions—the jury returned a verdict finding defendant guilty of murder in the second degree.[4]

## III

By instructing the jury on second degree felony murder based on discharge of a firearm at an inhabited dwelling house, the superior court erred.

The applicability of the second degree felony-murder rule, under the governing law, depends on an affirmative answer to this threshold question: is discharge of a firearm at an inhabited dwelling house, considered in the abstract, a felony inherently dangerous to human life? The answer, however, is *negative*. By its very terms, Penal Code section 246 declares that, "[a]s used in this section, 'inhabited' means currently being used for dwelling purposes, *whether occupied or not*." (Italics added.) Further, as noted above, "inherently dangerous to human life" has been defined to mean carrying " 'a high probability' that death will result." (*People* v. *Patterson*, *supra*, 49 Cal.3d at p. 627 (lead opn. of Kennard, J.); accord, *id*. at p. 640 (conc. & dis. opn. of Mosk, J.); *id*. at p. 641 (conc. & dis. opn. of Panelli, J.).) Logic dictates that discharge of a firearm at an inhabited dwelling house cannot carry " 'a high probability' that death will result" when Penal Code section 246 expressly does *not* require the presence of any occupant. Experience provides confirmation: to judge from reported appellate decisions, the prohibited conduct has resulted in death only in rare instances. Although such conduct has been called "extremely dangerous" (*In re Lynch* (1972) 8 Cal.3d 410, 431 [105 Cal.Rptr. 217, 503 P.2d 921]), it cannot be said to carry " 'a

[4]It was apparently the second degree felony-murder rule and not the facts of the case that caused the jury to have trouble reaching its verdict. Ironically, it was also the rule and not the facts that ultimately produced the determination of guilt. One juror subsequently stated: "It makes me sick and ashamed to have been part of a system that would convict someone like [defendant] of murder. Not everyone deserves a second chance but [he] does. The law is what dictated the verdict, not the jury." Another juror added: "If it wasn't for the scenario which said that the murder was a result of an intentional act of shooting into a dwelling which is a felony, then my vote would be for manslaughter. I do think that what [defendant] did was very *serious* but I would not rank him as a cold blooded killer."

high probability' that death will result." Surely, if the dwelling is not occupied at the time of the shooting, the "probability" of death is not "high"—it is *zero*.

Moreover, even if discharge of a firearm at an inhabited dwelling house, considered in the abstract, were in fact a felony inherently dangerous to human life, the applicability of the second degree felony-murder rule would depend on a negative answer to this further question under the "merger" doctrine: On the evidence adduced at trial, was defendant's discharge of a firearm at the inhabited dwelling house in question an "integral part" of, and "included *in fact*" within, the resulting homicide? The answer, however, is *affirmative*. Such was the case in *People* v. *Wesley* (1970) 10 Cal.App.3d 902, 905-908 [89 Cal.Rptr. 377], a decision we impliedly approved in *People* v. *Smith*, *supra*, 35 Cal.3d at page 805. Such is the case here. The record reveals that defendant was engaged in "a single course of conduct with a single purpose," viz., to commit "the very assault which resulted in death . . . ." (*People* v. *Burton*, *supra*, 6 Cal.3d at p. 387.) Whatever his precise motivation, he unquestionably decided to, and actually did, undertake an ultimately fatal assault, in the sense of a willful act "likely to result in . . . physical force" against another. (*People* v. *Colantuono*, *supra*, 7 Cal.4th at p. 218.) The record also reveals that he certainly did not exhibit any "independent felonious purpose." (*People* v. *Burton*, *supra*, 6 Cal.3d at p. 387, italics omitted; accord, *People* v. *Smith*, *supra*, 35 Cal.3d at p. 805.)

It follows from the foregoing that the superior court erred by instructing on second degree felony murder based on discharge of a firearm at an inhabited dwelling house.

The majority are to the contrary. Their analysis, however, proves inadequate.

To the threshold question, "Is discharge of a firearm at an inhabited dwelling house, considered in the abstract, a felony inherently dangerous to human life?," the majority answer, "Yes." They are wrong.

In large part, the majority rely on the "reasoning" and "language" (maj. opn., *ante*, at p. 310) of *People* v. *Satchell*, *supra*, 6 Cal.3d 28. There, we stated in dictum that a "ready example" (*id.* at p. 43, fn. 22) of a felony "in which danger to human life is inherent" (*id.* at p. 43) was discharge of a firearm at an inhabited dwelling house.

The "language" of the *Satchell* dictum provides little support. At the time *Satchell* was decided more than 20 years ago, Penal Code section 246

delineated a felony that came closer to being inherently dangerous to human life than it does today. The provision did not yet declare that " 'inhabited' means currently being used for dwelling purposes, *whether occupied or not*." (Pen. Code, § 246, as amended by Stats. 1977, ch. 690, § 1, p. 2220, italics added.)[5] Furthermore, at the time *Satchell* was decided, the definition of "inherently dangerous to human life" was less demanding than it is now, being satisfied, in words later used in *People* v. *Burroughs*, *supra*, 35 Cal.3d at page 833, by nothing more than a "substantial risk that someone will be killed . . . ." It had not yet become more stringent, requiring " 'a high probability' that death will result." (*People* v. *Patterson*, *supra*, 49 Cal.3d at p. 627 (lead opn. of Kennard, J.); accord, *id.* at p. 640 (conc. & dis. opn. of Mosk, J.); *id.* at p. 641 (conc. & dis. opn. of Panelli, J.).)

The "reasoning" of the *Satchell* dictum provides even less support. It is predicated on the view that the purpose of the second degree felony-murder rule is simply to deter persons engaged in felonies from committing those offenses. (*People* v. *Satchell*, *supra*, 6 Cal.3d at p. 43 [stating that "it is the deterrence of such acts by felons which the rule is designed to accomplish"].) That view is simply erroneous. (*People* v. *Smith*, *supra*, 35 Cal.3d at p. 807 [holding that the objective "is not to deter the underlying felony"].) The purpose of the rule is, rather, to deter persons engaged in felonies from killing negligently or accidentally. (*Ibid.*) That *Satchell* avoids this error elsewhere in its discussion (see *People* v. *Satchell*, *supra*, 6 Cal.3d at p. 34 [holding that the objective is "to deter those engaged in felonies from killing negligently or accidentally"]) does not remove the taint from the words in question.

In addition to relying on the "reasoning" and "language" of the *Satchell* dictum, the majority seek to fabricate a ground of their own. They do not meet with success.

The majority first assert: "The discharge of a firearm at an inhabited dwelling house—by definition, a dwelling 'currently being used for dwelling purposes, whether occupied or not' [citation]—is a felony whose commission inherently involves a danger to human life. An inhabited dwelling house is one in which persons reside [citation] and where occupants 'are generally *in* or *around* the premises.' [Citation, italics in original.] In firing a gun at such a structure, there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty

---

[5]It should be noted that in *People* v. *Chavira* (1970) 3 Cal.App.3d 988, 992 [83 Cal.Rptr. 851]—which *Satchell* does not cite—the Court of Appeal had construed "inhabited" in Penal Code section 246 to mean that "a person resides therein even though . . . temporarily unoccupied."

of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent [citation], the offense nonetheless is one that, viewed in the abstract—as shooting at a structure that currently is used for dwelling purposes—poses a great risk or 'high probability' of death . . . ." (Maj. opn., *ante*, at p. 310.)

The statement that "there always will exist a significant likelihood that an occupant may be *present*" (italics added) is supportable.

But the implication that "there will always exist a significant likelihood that an occupant may be *killed*" is not. At any given time, all occupants may be absent from the dwelling. School, work, shopping, leisure pursuits, and other activities may demand attendance outside, often for the greater part of the day. Even if an occupant is present, he may be in a part of the dwelling away from the shooting. The resident is necessarily smaller than the residence. Usually, *thousands of times so*. For example, an average adult man may stand in 1 square foot of floor space and take up 6 cubic feet of a room; by contrast, even a modest house may cover as many as *1,500* square feet and, with 8-foot ceilings, fill as much as *12,000* cubic feet. But even if an occupant happens to be near the shooting, the dwelling itself provides significant protection. To be sure, the exterior is commonly windowed. In most houses, however, structural soundness requires, and building codes demand, that load-bearing walls of wood or masonry backed by studs and sheetrock predominantly compose the shell. Although such walls may be penetrated by certain types of ammunition with sufficient velocity to injure a person within, they stop or at least slow all the rest. When they do so, they constitute a fortification.

Moreover, even if "the offense . . . pose[d] a great risk . . . of death," it would not matter. The prohibited conduct might be deemed "inherently dangerous to human life" under the former, less demanding definition, which was satisfied by nothing more than a "substantial risk that someone will be killed . . . ." (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 833.) But it would not qualify under the present, more stringent definition, which requires " 'a high probability' that death will result." (*People* v. *Patterson, supra,* 49 Cal.3d at p. 627 (lead opn. of Kennard, J.); accord, *id.* at p. 640 (conc. & dis. opn. of Mosk, J.); *id.* at p. 641 (conc. & dis. opn. of Panelli, J.).) The implication that a "great risk . . . of death" is a " 'high probability' of death" is dead wrong. (See *id.* at pp. 628-629 (conc. & dis. opn. of Lucas, C. J.).)

The majority then assert: "[A]pplication of the second degree felony-murder rule to a homicide resulting from a violation of [Penal Code] section

246 directly would serve the fundamental rationale of the felony-murder rule—the deterrence of negligent or accidental killings in the course of the commission of dangerous felonies." (Maj. opn., *ante*, at p. 310.) Are we then to conclude that the rule would lead a person who is minded to discharge a firearm at an inhabited dwelling house—"maliciously and willfully," as Penal Code section 246 requires—to blaze away with due caution and circumspection? To ask the question is to provide its answer. As stated above, the rule "can hardly be much of a deterrent to a defendant who has decided" to undertake an assault (*People* v. *Taylor, supra,* 11 Cal.App.3d at p. 63), in the sense of a willful act "likely to result in . . .. physical force" against another (*People* v. *Colantuono, supra,* 7 Cal.4th at p. 218). That Penal Code section 246 does not bear the label of "assault" is not dispositive. It embraces its substance. Because it does, it appears in the Penal Code in the chapter entitled "Assault and Battery." (Pen. Code, pt. 1, tit. 8, ch. 9.)

Next, to the question under the "merger" doctrine, "On the evidence adduced at trial, was defendant's discharge of a firearm at the inhabited dwelling house in question an 'integral part' of, and 'included *in fact*' within, the resulting homicide?," the majority answer, "No." Again, they are wrong.

In part, the majority would avoid the "merger" doctrine by limiting it to "circumstances where the only underlying . . . felony committed by the defendant was *assault.*" (Maj. opn., *ante*, at p. 311, italics in original.) Even if this limitation is sound—and apparently it is not (see *People* v. *Sears* (1970) 2 Cal.3d 180, 185-189 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Wilson, supra,* 1 Cal.3d at pp. 439-442)—it would not yield the result desired. That is because the only underlying felony committed by defendant here was in fact *assault*, in the sense of a willful act "likely to result in . . . physical force" against another. (*People* v. *Colantuono, supra,* 7 Cal.4th at p. 218.)

Additionally, the majority would avoid the "merger" doctrine by applying it purportedly in accordance with *People* v. *Mattison, supra,* 4 Cal.3d 177, and *People* v. *Taylor, supra,* 11 Cal.App.3d 57. They recognize that *Mattison* and *Taylor* each held the doctrine unavailable because the evidence adduced at trial therein revealed an "independent felonious purpose." (*People* v. *Burton, supra,* 6 Cal.3d at p. 387, italics omitted; accord, *People* v. *Smith, supra,* 35 Cal.3d at p. 805; see *People* v. *Taylor, supra,* 11 Cal.App.3d at p. 63 [speaking of " 'collateral and independent felonious design' "]; *People* v. *Mattison, supra,* 4 Cal.3d at p. 185 [quoting *Taylor*].) But they seem not to recognize that, as explained, the evidence adduced at trial *in this case* reveals no such "independent felonious purpose," but only an intent to commit an assault, in the sense indicated above. On second glance, perhaps they do

recognize the fact. Why else do they shrink back from fully embracing *Mattison* and *Taylor*?

Further, the majority attempt to avoid the "merger" doctrine by invoking *Aguirre* v. *State* (Tex.Crim.App. 1987) 732 S.W.2d 320 (in bank). *Aguirre* is distinguishable. In that case, the felony underlying the resulting homicide was "criminal mischief," a "property offense," which comprised an "attemp[t] to blow open a door with a shotgun" (*id.* at p. 325); it was undertaken with the "independent felonious purpose"—in our phrase—to effect an unlawful entrance into a residence. In this case, by contrast, the felony underlying the resulting homicide was discharge of a firearm at an inhabited dwelling house, a crime against the person (Pen. Code, pt. 1, tit. 8); it was undertaken simply to effect the ultimately fatal assault, in the sense indicated above.

Unable to avoid the "merger" doctrine, the majority come close to rendering it void. They reason that the doctrine is not available in this case because "[m]ost homicides do not result" from discharge of a firearm at an inhabited dwelling house. (Maj. opn., *ante*, at p. 315.) It follows that the doctrine would not be available *in any case* because most homicides do not result from any one felony. Such an outcome is untenable.[6]

IV

The superior court's error in instructing the jury on second degree felony murder based on discharge of a firearm at an inhabited dwelling house requires reversal of defendant's conviction of murder in the second degree.

When a legally erroneous theory of conviction is presented to the jury, reversal is required unless, on the record made at trial, the reviewing court can determine that the conviction actually, if not solely, rests on a legally

---

[6]The instruction on second degree felony-murder based on discharge of a firearm at an inhabited dwelling house also amounts to error under the United States Constitution.

An instruction in a state criminal trial omitting an element of a crime is violative of the due process clause of the Fourteenth Amendment. (*Rael* v. *Sullivan* (10th Cir. 1990) 918 F.2d 874, 875; *Cole* v. *Young* (7th Cir. 1987) 817 F.2d 412, 423-426; cf. *U.S.* v. *Gaudin* (9th Cir. 1994) 28 F.3d 943, 944-952 (in bank) [holding to the effect that an instruction in a federal criminal trial omitting an element of a crime is violative of the due process clause of the Fifth Amendment].)

The instruction here given omitted an element of murder in the second degree, viz., malice aforethought. (See, e.g., *People* v. *Henderson* (1977) 19 Cal.3d 86, 96 [137 Cal.Rptr. 1, 560 P.2d 1180], citing cases.) It might be argued that, whereas the statutory crime of second degree murder includes malice aforethought as an element (see Pen. Code, §§ 187, subd. (a), 188, 189), the "common law crime" does not. In California, however, "there are no common law crimes." (*In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017]; see Pen. Code, § 6.)

proper theory. (*People* v. *Guiton* (1993) 4 Cal.4th 1116, 1128-1129 [17 Cal.Rptr.2d 365, 365 P.2d 45]; see *People* v. *Smith, supra,* 35 Cal.3d at p. 808 [concluding that reversal of a second degree murder conviction is required unless the People can "show that no juror relied on the erroneous instruction" on second degree felony murder "as the sole basis for finding [the] defendant guilty"].)

In this case, a legally erroneous theory of conviction of murder in the second degree was indeed presented to the jury. That theory was second degree felony murder. It was legally erroneous because, as explained above, the rule was not applicable here under the governing law.

Further, on the record made at trial, we cannot determine whether defendant's conviction of murder in the second degree actually, if not solely, rests on a legally proper theory. Rather, the only determination that we can and indeed must make in this regard is that the conviction rests on the legally *erroneous* theory of second degree felony murder. The fact is established by the jury's guilty verdicts on second degree murder and discharge of a firearm at an inhabited dwelling house—which, under the evidence adduced and the instructions given, necessarily add up to second degree felony murder. (Cf. *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1086 [25 Cal.Rptr.2d 867, 864 P.2d 40] [arriving at a similar conclusion on a similar record].)[7]

Defendant's conviction of murder in the second degree must therefore be reversed.[8]

## V

For the reasons stated above, I would: (1) affirm the Court of Appeal's judgment affirming defendant's conviction of discharging a firearm at an

---

[7]See also footnote 4, *ante.*

[8]Insofar as the instruction on second degree felony murder based on discharge of a firearm at an inhabited dwelling house amounts to error under the United States Constitution, it requires reversal of defendant's conviction of murder in the second degree solely on that basis.

For error under the United States Constitution, the general rule is harmless-error analysis pursuant to *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], with its "reasonable doubt" standard; the exception is automatic reversal. (E.g., *Sullivan* v. *Louisiana* (1993) __ U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2081].)

The error here is automatically reversible. When, as in this case (see fn. 6, *ante*), an instruction omits an element of a crime, it "cannot be harmless." (*U.S.* v. *Gaudin, supra,* 28 F.3d at p. 951.)

Even if it were not automatically reversible, the error here cannot be held harmless beyond a reasonable doubt. Such a conclusion could be reached if, and only if, the jury's guilty verdict on murder in the second degree "was surely unattributable to the error." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].) As explained in the text, *that* condition is not, and cannot be, satisfied here.

inhabited dwelling house; (2) reverse its judgment affirming defendant's conviction of murder in the second degree; and (3) affirm its judgment setting aside the firearm-use sentence enhancement, which is dependent on the latter conviction.

**KENNARD, J.,** Concurring and Dissenting.—Defendant fired a handgun repeatedly into the apartment of Michael Echaves, killing 13-year-old Diane Rosalez. A jury convicted defendant of second degree murder after the trial court gave an instruction defining second degree felony murder and instructed the jury that discharging a firearm at an inhabited dwelling in violation of Penal Code section 246 was an "inherently dangerous felony" that could serve as the predicate felony for second degree felony murder.

The majority concludes, and I agree, that the offense of discharging a firearm at an inhabited dwelling is indeed an inherently dangerous felony for purposes of the second degree felony-murder rule, because under the standard articulated in my lead opinion in *People* v. *Patterson* (1989) 49 Cal.3d 615, 627 [262 Cal.Rptr. 195, 778 P.2d 549], it is "an offense carrying 'a high probability' that death will result." This court has never held that for a felony to pose a *high probability of death*, death must result from the commission of the felony in a majority, or even in a great percentage, of instances. Nor is it necessary in this case to define the outer limits of that term. The drive-by shootings that now plague our cities frequently result in the death of someone inside a residence. Even with no one present in the targeted house, the act of shooting at an inhabited house or apartment creates a substantial or serious risk of death to occupants of neighboring houses or to passersby. For these reasons, I agree with the majority that this offense is an inherently dangerous felony for purposes of the second degree felony-murder rule.

I disagree with the majority, however, when it concludes that the felony of discharging a weapon at an inhabited dwelling is one that does not "merge" with the resulting homicide within the meaning of our decision in *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. Under *Ireland*, which has been the law of this state for more than 25 years, a conviction for second degree felony murder cannot rest on a felony assault "that is an integral part of the homicide" and that, based on the prosecution's evidence, is "included *in fact*" within the resulting homicide. (*Id.* at p. 539, original italics.) Later decisions have added that a defendant's commission of a felony will support a felony murder conviction only if the defendant entertained some "independent felonious purpose" beyond mere assault. (*People* v. *Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Taylor* (1970) 11 Cal.App.3d 57, 63 [89 Cal.Rptr. 697], cited

with approval in *People* v. *Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193].) Here, the prosecution's evidence did not show that defendant had any independent felonious purpose for discharging the firearm at the Echaves residence. That conduct satisfies this court's definition of an assault. (*People* v. *Colantuono* (1994) 7 Cal.4th 206, 218 [26 Cal.Rptr.2d 908, 865 P.2d 704].) As Justice Mosk observes, it was "a willful act 'likely to result in . . . physical force' against another." (Conc. & dis. opn., *ante*, at p. 326].) As such, in this case the underlying felony of discharging a firearm at an inhabited dwelling house "merges" with the resulting homicide and cannot support the second degree murder conviction.

Although from the facts of this case a jury could find that the defendant harbored malice and accordingly could base a second degree murder conviction on an implied malice theory (rather than a felony-murder theory), I agree with Justice Mosk that defendant's second degree felony-murder conviction must be reversed because the record does not reveal whether the jury ever made the findings necessary to support a second degree murder conviction premised on implied malice. I would remand this case to give the prosecution the opportunity to retry the murder charge on a theory of implied malice.

Appellant's petition for a rehearing was denied February 23, 1995. Mosk, J., and Kennard, J. were of the opinion that the petition should be granted.