Filed 7/7/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MICHAEL HANSEN on Habeas Corpus. | D063549 |
| | (Super. Ct. No. HC19540) |

APPEAL from an order of the Superior Court of San Diego County, Gale E. Kaneshiro, Judge. Affirmed.

Bonnie M. Dumanis, District Attorney, Laura Tanney, James E. Atkins and Craig E. Fisher, Deputy District Attorneys, for Appellant.

Henry C. Coker, Public Defender, Randy Mize, Chief Deputy Public Defender, and Matthew Braner, Deputy Public Defender, for Respondent.

In 1992, a jury convicted Michael Hansen of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] and found that Hansen personally used a firearm within the meaning of section 12022.5, subdivision (a). The jury also convicted Hansen of one count of shooting at an inhabited dwelling. (§ 246.) On appeal, the Supreme Court affirmed Hansen's conviction. (*People v. Hansen* (1994) 9 Cal.4th 300, 311 (*Hansen*).)

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Rejecting Hansen's contention to the contrary, the Supreme Court determined that the offense of shooting at an inhabited dwelling did not "merge" with a homicide that results from such a shooting. (*Id.* at p. 316.) The offense of shooting at an inhabited dwelling could therefore form the basis for a second degree felony-murder conviction. (*Ibid.*) Fifteen years later, the Supreme Court reconsidered the scope of the second degree felony-murder rule and expressly overruled this holding. (*People v. Chun* (2009) 45 Cal.4th 1172, 1199 (*Chun*).) In *Chun*, the Supreme Court determined that the offense of shooting at an inhabited dwelling was "assaultive" in nature, and thus merged with a resulting homicide, such that the second degree felony-murder rule could not apply. (*Id.* at p. 1200.)

Relying on *Chun*, Hansen filed a petition for writ of habeas corpus in the San Diego County Superior Court. Hansen argued that the Supreme Court's holding in *Chun* applied to the theory of second degree felony murder presented at his trial, that it was therefore error for his jury to have been instructed that second degree felony murder was a valid theory for a conviction, and that error required reversal of his conviction for second degree murder. The trial court agreed and granted Hansen's petition.

The People of the State of California, represented by the San Diego County District Attorney (District Attorney), appeal. The District Attorney contends that the trial court erred in applying *Chun* retroactively to Hansen's conviction and in finding reversible error. The District Attorney further contends that the trial court erred in considering certain statements and declarations from jurors in Hansen's underlying trial in assessing the prejudicial impact of the error. We conclude that the court properly gave

2

retroactive effect to *Chun* and, even setting aside the juror statements and declarations, that the error under *Chun* was prejudicial. We therefore affirm the trial court's order.

FACTS

We adopt the statement of facts that the Supreme Court articulated in *Hansen*:

"On September 19, 1991, defendant Michael Hansen, together with Rudolfo Andrade and Alexander Maycott, planned to purchase $40 worth of methamphetamine. With that purpose, defendant, accompanied by his girlfriend Kimberly Geldon and Maycott, drove in defendant's Camaro to an apartment duplex located in the City of San Diego. Upon arriving at the duplex, defendant pounded on the door of the upstairs apartment where Christina Almenar resided with her two children. When he received no response, defendant proceeded to return to his automobile and was approached by Michael Echaves.

"Echaves resided in the downstairs apartment with Martha Almenar (Christina's sister) and Martha's two children, Diane Rosalez, thirteen years of age, and Louie Miranda, five years of age. At the time, Diane and Louie were outside with Echaves helping him with yard work. In response to a question from Echaves, defendant said he was looking for Christina. When Echaves stated he had not seen her, defendant asked whether Echaves would be able to obtain some crystal methamphetamine (speed). After making a telephone call, Echaves informed defendant that he would be able to do so. Defendant said he would attempt to purchase the drug elsewhere but, if unsuccessful, would return.

3

"Defendant and his companions departed but returned approximately 20 minutes later. Defendant, accompanied by Echaves, Maycott, and Geldon, then drove a short distance to another apartment complex. Defendant parked his vehicle, gave Echaves two $20 bills, and told Echaves he would wait while Echaves obtained the methamphetamine. Echaves said he would be back shortly.

"When Echaves failed to return, defendant and his companions proceeded to Echaves's apartment. Defendant knocked on the door and the windows. Diane and Louie were inside the apartment alone but did not respond. Their mother, Martha, had left the apartment to meet Echaves, who had telephoned her after eluding defendant. After meeting Echaves at a hardware store, Martha telephoned her children from a public telephone booth. Diane answered and told her mother that the 'guys in the Camaro' had returned, pounded on the door, and then had left.

"Meanwhile, defendant, Maycott, and Geldon returned to the location where Andrade was waiting for them, acquiring en route a handgun from an acquaintance. The three men then decided to return to Echaves's apartment with the objective either of recovering their money or physically assaulting Echaves. At approximately 7:30 p.m., defendant approached the apartment building in his automobile with the lights turned off, and then from the vehicle fired the handgun repeatedly at the dwelling. At the time, Diane was inside the apartment, in the living room with her brother. The kitchen and living room lights were on. Diane was struck fatally in the head by one of the bullets fired by defendant.

4

"On the basis of information furnished by witnesses to the shooting, the police were able to trace to defendant the vehicle from which the shots had been fired. On September 20, at approximately 3 a.m., police officers arrested defendant at the room of a motel where he was staying. Searching the trunk of his Camaro, the police discovered a nine-millimeter semi-automatic handgun and an empty ammunition clip for the weapon.

"Five bullet holes were found at the scene of the homicide inside the apartment. It later was determined that shell casings and three bullets recovered at that location had been fired from the handgun found inside the trunk of defendant's vehicle.

"That same morning, at 7 a.m., defendant was advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) and waived them. He then confessed to having fired several shots from a handgun aimed at the apartment building. He stated that he had been waiting for someone whom he believed 'took off with forty bucks' belonging to him, that he was shooting at '[j]ust the house,' and that he would not have engaged in this conduct had he known 'those kids were in there.'

"At trial, as part of the defense case, defendant testified that on the day of the shooting he had consumed a substantial quantity of alcohol and some crystal methamphetamine. He further testified that, when he initially returned to Echaves's apartment, he had observed the lights were on, but after knocking on the door and receiving no response, he believed no one was inside. He denied any recollection of actually having fired the shots at the apartment, although he remembered hearing 'four or five loud noises,' and denied having intended to harm anyone.

5

"A neurologist and a neuropsychologist testified that defendant suffered from a mild prefrontal lobe injury that, in conjunction with the use of alcohol and drugs, could result in sudden, unplanned, and impulsive actions. A toxicologist testified regarding defendant's blood-alcohol level and its possible effects, based upon defendant's report as to the amount of alcohol he had consumed prior to the shooting. (His testimony did not refer to the possible effect of defendant's use of crystal methamphetamine, as testified to by defendant.)

"The trial court instructed the jury on several theories of murder, including second degree felony murder as an unlawful killing that occurs during the commission or attempted commission of a felony inherently dangerous to human life, and further instructing that the felony of shooting at an inhabited dwelling is inherently dangerous to human life. The jury returned a verdict finding defendant guilty of second degree murder (without specifying the theory upon which the conviction was based), and found true the allegation that he personally used a firearm during the commission of that offense (§ 12022.5, subd. (a)). The jury also found defendant guilty of discharging a firearm at an inhabited dwelling. At sentencing, the trial court imposed a term of imprisonment of 15 years to life for the second degree murder conviction, plus a consecutive term of 4 years for the personal-use-of-a-firearm enhancement. The court also imposed a term of five years for the offense of shooting at an inhabited dwelling, but stayed the sentence for that offense pursuant to section 654." (*Hansen, supra*, 9 Cal.4th at pp. 305-307.)

DISCUSSION

I

In this habeas appeal, "[o]ur standard of review is de novo with respect to questions of law and the application of the law to the facts. We accept as final the superior court's resolution of pure questions of fact if they are supported by substantial evidence." (*In re Richards* (2012) 55 Cal.4th 948, 960.) Where, as here, the trial court did not hear evidence or make findings of fact, our review of the trial court's order is de novo. (*Ibid.*)

"[B]ecause petitioner seeks to overturn a final judgment in a collateral attack, he bears the burden of proof. [Citation.] ' "For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended." ' [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 710.)

II

A

The District Attorney first contends that the trial court erred in finding that *Chun* could apply to Hansen's habeas petition because Hansen's conviction was final on appeal 15 years prior to the decision in *Chun*. The District Attorney urges that we reject the holding of *In re Lucero* (2011) 200 Cal.App.4th 38 (*Lucero*), in which the Court of Appeal for the Third Appellate District found that *Chun* could be applied retroactively to a conviction that was already final on appeal when *Chun* was decided. (*Lucero, supra,* at

7

p. 46.) The District Attorney argues that due process, under either the federal or the California Constitution, does not require that judicial changes to California criminal law be applied retroactively to convictions that are final on appeal. Instead, she contends, well-settled principles of finality counsel against retroactivity in this case.

Hansen counters that *Lucero* was correctly decided and that *Chun* should be applied to convictions that were already final on appeal. Hansen argues that California has adopted the rule applicable to federal criminal law, which requires that judicial decisions that narrow the scope of criminal liability be applied retroactively to convictions that are final on appeal. (See *Schriro v. Summerlin* (2004) 542 U.S. 348, 351-352 (*Schriro*).) Hansen further argues that failure to find retroactivity here would be unjust and would constitute a miscarriage of justice because the Supreme Court in *Chun* adopted the very arguments that Hansen advanced in his direct appeal.

B

We begin with a brief summary of the Supreme Court's decision in *Chun*. The defendant in *Chun* was accused of taking part in a fatal car-to-car shooting. The victim was shot while the car in which he was riding was stopped at a traffic light. (*Chun, supra*, 45 Cal.4th at pp. 1178-1179.) The defendant was a passenger in another car that stopped near the car in which the victim was riding, from which the shots were fired. (*Id.* at p. 1179.) The defendant was prosecuted as the direct shooter and also, in the alternative, as an aider and abettor. (*Ibid.*) After receiving instruction on several theories of murder, including second degree felony murder, the jury convicted the defendant of second degree murder without specifying its theory. (*Ibid*.) On appeal, the defendant

8

contended that the second degree felony-murder rule had no statutory basis and was therefore unconstitutional. (*Id.* at p. 1180.) The defendant further contended that the second degree felony-murder rule, even if valid, could not apply to him because the underlying felony at issue, shooting at an occupied motor vehicle (§ 246), merged with the resulting homicide. (*Id.* at p. 1189.)

Because " '[t]here are no . . . nonstatutory crimes in this state' [citation]," the Supreme Court first examined the statutory basis for the second degree felony-murder rule. (*Chun, supra*, 45 Cal.4th at p. 1183.) By statute, murder in California requires "malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Implied malice may be shown "when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) In *Chun*, the Supreme Court determined that that the second degree felony-murder rule is simply another interpretation of the "abandoned and malignant heart" requirement. "The willingness to commit a felony inherently dangerous to life is a circumstance showing an abandoned and malignant heart." (*Chun, supra*, 45 Cal.4th at pp. 1187-1188.) Thus, the second degree felony-murder rule has a statutory basis. (*Ibid.*)

The *Chun* court noted that although the second degree felony-murder rule originally applied to all felonies, the court "has subsequently restricted its scope in at least two respects to ameliorate its perceived harshness." (*Chun, supra*, 45 Cal.4th at p. 1188.) One restriction is the "merger doctrine," which "developed due to the understanding that the underlying felony must be an independent crime and not merely

9

the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for the purposes of felony murder." (*Id.* at p. 1189.)

Various interpretations of the merger doctrine have developed over the years, among them, the decision in *Hansen.* The Supreme Court in *Chun* swept away much of the prior case law in this area and announced a definitive test for merger: "When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An 'assaultive' felony is one that involves a threat of immediate violent injury." (*Chun, supra*, 45 Cal.4th at p. 1200.) In formulating the new test for merger, the Supreme Court expressly overruled *Hansen*, which had held that the offense of shooting at an inhabited dwelling (§ 246) did not merge with a resulting homicide. (*Chun, supra*, 45 Cal.4th at p. 1199.) The ultimate effect of *Chun*, as relevant to Hansen, is to further reduce the scope of the second degree felony-murder rule by expanding the judicial merger doctrine to include all assaultive felonies.

C

The *Chun* opinion does not state whether it applies retroactively to convictions, like Hansen's, that were final on appeal when *Chun* was decided. It is well-settled that a habeas petitioner may obtain relief where "there has been a change in the law affecting the petitioner." (*In re Harris* (1993) 5 Cal.4th 813, 841 (*Harris*).) The threshold question presented here, however, is whether *Chun* effected a change in the law that has retroactive effect, i.e., whether the law affecting Hansen, himself, has changed.

10

Our Supreme Court has not articulated a single test to determine when and under what circumstances a decision should be given retroactive effect to convictions that are final on appeal.  In certain cases, the Supreme Court has embraced an expansive theory of retroactivity.  For example, in *People v. Mutch* (1971) 4 Cal.3d 389 (*Mutch*), the Supreme Court considered the retroactive effect of its decision overruling established precedent regarding the scope of the offense of aggravated kidnapping.  (*Id.* at p. 392.) The court determined that its decision should be given full retroactive effect to convictions that were final on appeal.  (*Id.* at p. 396.)  The court reasoned that because all crimes in California are statutory, the Supreme Court's new interpretation of the aggravated kidnapping statute was not a change in the law at all.  (*Id.* at p. 394.)  Instead, the Supreme Court viewed its decision as a confirmation of the correct interpretation of the statute that should have been applied since its enactment.  (*Ibid.* ["[W]e did not overturn a judge-made rule of common law; rather, we recognized a statutory rule which the Legislature adopted in 1951 but to which courts had not previously given appropriate effect"].)  Given this interpretation, the Supreme Court explained that it need not "undertake the often-perilous task of applying to the facts of this case the test of 'retroactivity' developed in a well-known series of decisions of the United States Supreme Court."  (*Ibid.*)

In other cases, largely involving questions of procedure, the Supreme Court has applied a tripartite test derived from the more established criteria for determining the

11

retroactivity of judicial opinions to convictions not yet final on appeal.[2]  The tripartite

test consists of three elements: " '(a) the purpose to be served by the new standards,

(b) the extent of the reliance by law enforcement authorities on the old standards, and

(c) the effect on the administration of justice of a retroactive application of the new

standards.'  [Citation.]"  (*In re Dabney* (1969) 71 Cal.2d 1, 9; see *In re Johnson* (1970) 3

Cal.3d 404, 410 (*Johnson*).)

     In *Lucero*, the parties agreed that this tripartite test governed the retroactivity of

*Chun* to convictions that were final on appeal when *Chun* was decided.  (*Lucero, supra*,

200 Cal.App.4th at p. 45.)  Quoting *Johnson, supra*, 3 Cal.3d at page 413, the court

distilled the tripartite test down to one primary issue: " 'the more directly the new rule in

question serves to preclude the conviction of innocent persons, the more likely it is that

the rule will be afforded retrospective application.' "  (*Lucero, supra*, 200 Cal.App.4th at

p. 45.)  The court determined that *Chun* should apply retroactively to convictions that

were final on appeal because the effect of *Chun* was to narrow a defendant's potential

liability for second degree murder.  "Because application of the new rule announced in

---

2     Our Supreme Court has stated that an appellate opinion will govern convictions
not yet final on appeal where the opinion does not announce a change in the law or where
the opinion announces a new rule of law where no rule existed before. (See *People v.
Guerra* (1984) 37 Cal.3d 385, 399 (*Guerra*).)  Where an opinion announces a new rule of
law, but a contrary rule previously existed, "the courts may choose to make, on grounds
of policy, an exception to 'the ordinary assumption of retrospective operation' [citation]."
(*Id.* at p. 401.)  "At the present time the California courts decide whether to make such an
exception by weighing the three factors summarized in *Stovall v. Denno* (1967) 388 U.S.
293, 297: '(a) the purpose to be served by the new standards, (b) the extent of the reliance
by law enforcement authorities on the old standards, and (c) the effect on the
administration of justice of a retroactive application of the new standards.' [Citations.]"
(*Guerra, supra,* at p. 401; see *People v. Garcia* (1984) 36 Cal.3d 539, 548-549.)

*Chun* directly affects inmates such as Lucero, who might have been acquitted of murder *but for* application of the felony-murder rule, it impacts the reliability of his murder conviction." (*Id.* at p. 46.) Although couched in terms specific to the defendant in that case, *Lucero* would apply with equal force to any defendant whose conviction potentially rests on a theory of second degree felony murder that was rejected in *Chun*, including Hansen.

D

The question presented is whether this court should follow *Lucero* and apply *Chun* retroactively to Hansen's conviction. "We, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But '[w]e respect stare decisis . . . which serves the important goals of stability in the law and predictability of decision. Thus, we ordinarily follow the decisions of other districts without good reason to disagree.' [Citation.]" (*The MEGA Life and Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 (*MEGA Life*).)

The District Attorney argues that *Lucero* was wrongly decided and should not be followed. The District Attorney correctly points out that *Johnson*, on which *Lucero* heavily relies, involved an allegedly unconstitutional "prior," i.e., a prior offense that was introduced to enhance punishment, rather than a straightforward habeas challenge. (*Johnson, supra*, 3 Cal.3d at p. 410.) The discussion of retroactivity in *Johnson* was not so limited, however, since the Supreme Court sought to answer the same question that is presented here: whether a subsequent judicial decision operated retroactively to invalidate a conviction that was final on appeal. (*Id.* at pp. 410-413.) The District Attorney is also

13

correct that *Guerra*, on which *Lucero* also relies, discussed retroactive application only to convictions that were still pending on appeal, not convictions that were final on appeal. (See *Guerra, supra*, 37 Cal.3d at p. 413, fn. 24 ["[W]e do not reach the question whether the . . . rule applies on collateral attack to cases now final"].) These distinguishing aspects do not, however, undermine *Lucero*'s holding or reasoning.

The District Attorney also addresses the tripartite test as applied in *Lucero*. Regarding "the purpose to be served by the new standards" (*Guerra*, *supra*, 37 Cal.3d at p. 401), the District Attorney maintains that *Chun* was intended not to rectify a great injustice, but rather, to create a uniform standard for the application of the second degree felony-murder rule. The District Attorney points to the opinion of the New York Court of Appeals in *Policano v. Herbert* (2006) 7 N.Y.3d 588 (*Policano*), in which, she claims, the court considered an analogous situation. In *Policano*, the court applied an identical tripartite test to the question of whether a change in the law of "depraved indifference" murder in New York should be applied retroactively. The court determined that the purpose of the change in the law was to "dispel the confusion between intentional and depraved indifference murder" (*id*. at p. 603) and that "nonretroactivity poses no danger of a miscarriage of justice" (*id*. at p. 604). The court stated, " '[d]efendants who commit[] vicious crimes but who may have been charged and convicted under the wrong section of the statute are not attractive candidates for collateral relief . . . .' [Citation]." (*Ibid*.) The District Attorney also argues that the *Lucero* court gave inadequate weight to the second and third prongs of the tripartite test, which focus on finality and the orderly administration of justice.

14

We conclude that *Lucero* properly applied the tripartite test. The purpose of *Chun* was to separate those actions that are punishable as second degree murder from those that are not. The holding in *Chun*, at least as applicable here, reflects a narrowing of the class of conduct that may constitute second degree murder. The expanded merger doctrine announced in *Chun* could render some defendants who were previously convicted under the second degree felony-murder rule entirely innocent of murder. Here, unlike *Policano*, the change in scope of the second degree felony-murder rule may mean that certain accidental—rather than "vicious"—killers may have been convicted of murder under the rule announced in *Hansen* but would not have been convicted under the new rule announced in *Chun*. The *Chun* decision therefore goes directly to the question of guilt or innocence of a defendant and the validity of his conviction. (See *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 258 ["That purpose implicates questions of guilt and innocence, for conduct which a trier of fact might have found criminal under the older vague definition may clearly fall beyond the scope of the statute as construed in the present case"].) The second and third prongs, " ' "the extent of the reliance by law enforcement authorities on the old standards, and . . . the effect on the administration of justice of a retroactive application of the new standards" ' [citation]," are much less significant than the first. (*Johnson, supra*, 3 Cal.3d at p. 410.) Although applying *Chun* retroactively in this case will result in the additional use of scarce judicial resources, the purpose of the *Chun* rule clearly outweighs such considerations.[3]

---

[3]    Because *Chun* resulted in a reinterpretation of the statute governing murder,

15

More broadly, the District Attorney contends that habeas relief is available "to correct errors of a fundamental jurisdictional or constitutional type only." (*Harris, supra*, 5 Cal.4th at p. 828.) The District Attorney argues that this language reflects a limitation on the scope of habeas relief since *Johnson* – on which *Lucero* relies – was decided. But the supporting citation for this language is *In re Winchester* (1960) 53 Cal.2d 528, which was decided well before *Johnson*. We are not persuaded that this general language precludes consideration of Hansen's petition. (See *Harris, supra*, 5 Cal.4th at p. 841.)

The District Attorney further argues that principles of finality and law of case generally preclude habeas relief. Such general principles are unpersuasive where, as here, habeas relief is in fact available based on changed law, at least in some circumstances. (See *Harris, supra*, 5 Cal.4th at p. 843 ["The rule discussed above that one may renew on habeas corpus certain challenges to a final judgment even after unsuccessfully raising the issue on direct appeal, however, presupposes that no law of the case barrier exists"]; see also *Mutch, supra*, 4 Cal.3d at p. 396.) Moreover, it is well-settled that the doctrine of law of the case will not be applied "when an intervening decision has altered or clarified the controlling rules of law . . . ." (*People v. Jurado*

particularly its language pertaining to an "abandoned and malignant heart," it could be argued that our Supreme Court's decision in *Mutch* requires that we apply *Chun* retroactively to convictions that were final on appeal without reference to the tripartite test, which appears tailored to procedural, and not substantive, changes in criminal law. (See *Mutch, supra*, 4 Cal.3d at p. 394.) The federal courts appear to use a rule similar to that articulated in *Mutch*. Under the federal standard, changes to the scope of substantive federal criminal law must generally be applied retroactively to convictions that are final on appeal. (See *Schriro, supra*, 542 U.S. at pp. 351-352.) However, given our conclusion that *Chun* should be applied retroactively even under the tripartite test, and since the parties have not addressed the applicability of *Mutch* in their briefing, we decline to discuss it here.

16

(2006) 38 Cal.4th 72, 94.)  We do not find the District Attorney's analogy to the rule in *In re Estrada* (1965) 63 Cal.2d 740 enlightening, since it does not assist us in determining when judicial changes in the law must be applied retroactively to convictions that are final on appeal.

Because the District Attorney has not established "good reason to disagree" with the holding in *Lucero*, and we find its application of the tripartite test persuasive, we follow it here.  (See *MEGA Life, supra*, 172 Cal.App.4th at p. 1529.)

E

The parties dispute an additional issue: whether the federal Constitution's guarantee of due process requires California to apply *Chun* retroactively to convictions that are final on appeal.  (See *Fiore v. White* (2001) 531 U.S. 225, 228.)  Because we conclude that *Chun* should be applied retroactively to convictions that are final on appeal based on California law, we need not address whether the federal Constitution's guarantee of due process would mandate such a result, as well.

III

A

In view of our conclusion that *Chun* should be applied retroactively to Hansen's conviction, it was error for Hansen's jury to be presented with a theory of second degree felony murder based on the underlying offense of shooting at an inhabited dwelling.  (See *Chun, supra*, 45 Cal.4th at p. 1201.)  We must next determine whether this error was prejudicial.

17

The parties dispute the applicable standard of review. The District Attorney argues that California's harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818 should apply because the decision to apply *Chun* retroactively is a matter of state law. Under the *Watson* standard, a court must determine whether or not it is "reasonably probable that a result more favorable to the defendant would have been reached in the absence of the alleged error." (*People v. Thomas* (2011) 52 Cal.4th 336, 356.) Hansen argues that the federal "beyond a reasonable doubt" standard under *Chapman v. California* (1967) 386 U.S. 18 should apply because the error goes to an element of second degree murder. "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*Chun, supra*, 45 Cal.4th at p. 1201.)

The District Attorney acknowledges that *Chun* would require application of the *Chapman* standard on direct appeal, but argues that our habeas review should be more deferential. For that proposition, the District Attorney cites only *Chun*, in which the court found a statement of the ostensibly more deferential federal habeas standard to be consistent with the *Chapman* standard. (*Chun*, *supra*, 45 Cal.4th at p. 1204 [discussing *California v. Roy* (1996) 519 U.S. 2].) *Chun* therefore provides no support for the District Attorney's contention that we should depart from the *Chapman* standard here, and we decline to do so. (See *Lucero, supra*, 200 Cal.App.4th at pp. 48, 50 [applying two variations of the *Chapman* standard].)

18

B

"When the prosecution presents its case to the jury on alternate theories, one of which is legally correct and the other legally incorrect, 'we must reverse the conviction unless it is beyond a reasonable doubt that the error did not contribute to the jury's verdict. [Citation.] Such a reasonable doubt arises where, although the jury was instructed on alternate theories, there is no basis in the record for concluding that the verdict was based on a valid ground. . . . [Citations.]' [Citation.]" (*People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306-1307.)

Where, as here, the jury was instructed on a legally correct theory of implied malice second degree murder and a legally incorrect theory of second degree felony murder, the error is harmless only "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice . . . ." (*Chun, supra*, 45 Cal.4th at p. 1205.) However, "if the jury reasonably could have convicted [Hansen] of second degree murder based on felony murder and *not* express or implied malice, we reverse." (*People v. Bejarano* (2007) 149 Cal.App.4th 975, 990 (*Bejarano*), italics added.)

Hansen's jury found him guilty of second degree murder, without specifying its theory, and additionally found that he personally used a firearm in committing the murder. The jury also found Hansen guilty of shooting at an inhabited dwelling. (§ 246.) By itself, the jury's verdict provides no indication that the jury rested its second degree murder verdict on the legally valid theory of implied malice murder.

19

The District Attorney points out that both the prosecution and Hansen's counsel told the jury during closing arguments that it could not find the personal firearm use enhancement true if it relied on a felony-murder theory. Although the court also believed this principle of law to be correct, it was not included in the court's instructions to the jury.[4]

If the court's jury instructions had included the admonition that the jury could find true the personal firearm use enhancement only if it did not rely on a felony-murder theory, such an instruction would properly inform our interpretation of the jury's verdict. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804; see *People v. Avila* (2006) 38 Cal.4th 491, 574.) The jury's finding on the personal firearm use enhancement would provide an indication that the erroneous felony-murder theory was not the basis of the jury's verdict. (See *Chun, supra*, 45 Cal.4th at p. 1205 [jury verdict implied all findings required under the court's instructions]; see also *People v. Ireland* (2010) 188 Cal.App.4th 328, 340.)

Here, however, the court's jury instructions did not include any such admonition. Instead, this principle was stated only by counsel. Unlike jury instructions, principles of

---

4    The Supreme Court in *Hansen* later determined, contrary to counsel's statements and the trial court's belief, that a jury could find both second degree felony murder and the personal firearm use enhancement. (*Hansen, supra*, 9 Cal.4th at p. 316.)

law that are expressed only by counsel are not binding on the jury. The court instructed Hansen's jury on this point: "You must accept and follow the law as I state it to you, whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during trial conflicts with my instructions on the law, you must follow my instructions." We cannot presume that the jury followed legal principles that were articulated only by counsel, and not by the court. This is particularly true in this case since, absent counsel's comments, there is no reason why a lay jury would think that rendering a true finding on the personal firearm allegation would conflict with finding Hansen guilty of murder based on a felony-murder theory.[5] Under the court's instructions, the jury was free to find the personal firearm use enhancement true and, at the same time, rely on the legally erroneous felony-murder theory for its second degree murder verdict. The true finding on the personal firearm use enhancement thus provides no basis for us to conclude that the *Chun* error here was harmless.

2

The District Attorney further contends that any rational jury would have had to convict Hansen of second degree murder, on an implied malice theory, given the evidence presented at trial. "[A] demonstration of harmless error does not require proof that a particular jury '*actually* rested its verdict on the proper ground [citation], but rather on proof beyond a reasonable doubt that *a rational jury* would have found the defendant

---

5    As noted previously (see fn. 4, *ante*), in *Hansen*, *supra*, 9 Cal.4th at page 316, the Supreme Court clarified that there is in fact no such conflict under California law.

21

guilty absent the error [citation]' . . . . [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 643, 666; see *Chun, supra*, 45 Cal.4th at p. 1205.) In this context, we must "exhaustively review[] the trial evidence to determine 'whether the record contains evidence that could rationally lead to a contrary finding . . . ' [citation]," i.e., a jury finding that Hansen did not harbor implied malice. (See *People v. Gonzales, supra*, at p. 666.)

Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*Chun, supra*, 45 Cal.4th at p. 1181.) "Implied malice requires that the defendant act with a wanton disregard for the high probability of death [citation], thereby requiring a *subjective awareness* of a high degree of risk [citation]. It is not enough that a *reasonable person* would have been aware of the risk. [Citation.]" (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 842; see also *People v. Watson* (1981) 30 Cal.3d 290, 296-297 ["[A] finding of implied malice depends upon a determination that the defendant *actually* appreciated the risk involved, i.e., a *subjective* standard."].)[6]

---

6      Contrary to the dissent's suggestion, implied malice requires more than knowledge that one's conduct is "dangerous" or "extremely dangerous." (See *Chun, supra*, 45 Cal.4th at p. 1181.) It is likewise insufficient that the underlying offense at issue here, shooting at an inhabited dwelling, has been characterized as an "inherently dangerous" felony in the abstract. (See *Hansen, supra*, 9 Cal.4th at pp. 310-311.) A defendant who commits an inherently dangerous felony need not subjectively appreciate that his conduct is, in fact, inherently dangerous. (See *People v. Ramirez* (2009) 45 Cal.4th 980, 985

The record contains evidence that would support a finding that Hansen did not harbor implied malice because he did not subjectively appreciate that his actions carried a high probability of death. Hansen testified that, at the time of the shooting, he did not believe there was any chance anyone was inside the apartment at the time he shot at it. Before shooting at the apartment, Hansen went to the apartment twice, knocked on doors and windows, and did not get any response. His testimony was corroborated by the surviving child, Louie, who testified that people pounded on the windows and doors of the apartment twice prior to the shooting. Louie and his sister stayed quiet because their mother had told them not to answer the door. Given this evidence, a rational juror could find that Hansen lacked a subjective awareness that his actions carried a high probability of death because he did not think that anyone was in the apartment at the time he shot at it. Because a rational juror could disbelieve the prosecution's theory of implied malice murder, we cannot say beyond a reasonable doubt that the jury's second degree murder verdict *necessarily* rests on a theory of implied malice. The error here was therefore prejudicial. (See *People v. Gonzales, supra*, 54 Cal.4th at p. 666.)

The District Attorney argues that the circumstances of the shooting and Hansen's pretrial statements to police would compel any rational juror to find that Hansen harbored implied malice. The District Attorney points out that Hansen knew that people lived in the apartment. In addition, Hansen also chose to fire multiple times across the length of

---

[elements of shooting at an inhabited dwelling are "(1) acting willfully and maliciously, and (2) shooting at an inhabited house"].) By contrast, implied malice requires that a defendant subjectively know that his conduct carried a high probability of death. (See *People v. Canizalez, supra*, 197 Cal.App.4th at p. 842; see also *Chun, supra*, 45 Cal.4th at p. 1181.)

23

the apartment, and it was undisputed that at least one light was on in the apartment at the time of the shooting. While "[m]alice may be inferred from the circumstances of the murder" (*People v. Canizalez, supra*, 197 Cal.App.4th at p. 842), and the evidence cited by the District Attorney would support a verdict based on implied malice, that does not mean that a contrary finding would be irrational, given Hansen's testimony about his subjective state of mind.[7]

---

[7] Similarly, we agree with dicta in *People v. Taylor* (2004) 32 Cal.4th 863, 868 (*Taylor*), that "if a gunman simply walked down the hall of an apartment building and fired through closed doors, he would be liable for the murder of all of the victims struck by his bullets," i.e., there would be sufficient evidence under those facts to support a conviction for second degree murder on a theory of implied malice. (*Ibid.*) In *Taylor*, the Supreme Court considered whether a defendant who fatally shot a pregnant woman could be liable for second degree implied malice murder of her fetus, even though the defendant did not know that the woman was pregnant. (*Id*. at p. 865.) Analogizing those facts to the apartment gunman, the Supreme Court determined that the defendant could be liable for second degree implied malice murder of the fetus: "When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim." (*Id.* at p. 868.)

The scenarios considered in *Taylor* are distinguishable from the facts here. Hansen's corroborated testimony was that he knocked on doors and windows of the apartment before he shot. Unlike the hypothetical apartment gunman in *Taylor*, Hansen thus arguably had reason to believe that the apartment was unoccupied at the time he shot into it. In addition, the defendant in *Taylor* knew of the existence of the pregnant woman (although not the fact of her pregnancy) when he shot her. (*Taylor, supra,* 32 Cal.4th at p. 866; see *id.* at p. 869 ["In battering and shooting [the woman], defendant acted with knowledge of the danger to and conscious disregard for life in general. That is all that is required for implied malice murder. He did not need to be specifically aware how many potential victims his conscious disregard for life endangered."].) Moreover, unlike *Taylor*, the relevant question here is not whether there is substantial evidence that would support Hansen's conviction. Instead, we must "exhaustively review[] the trial evidence to determine 'whether the record contains evidence that could rationally lead to a contrary finding . . . ' [citation]." (See *People v. Gonzales, supra*, 54 Cal.4th at p. 666.) The scenarios considered in *Taylor* are of little relevance to this task. *Taylor* does not

24

The disputed evidence regarding the mental component of implied malice distinguishes this case from *Chun*, where the Supreme Court found a similar error harmless. In *Chun*, the victim was a passenger in a friend's car. (*Chun, supra*, 45 Cal.4th at p. 1179.) "While they were stopped in the left turn lane at a traffic light, a blue Honda with tinted windows pulled up beside them. When the light changed, gunfire erupted from the Honda, hitting all three occupants of the [other car]." (*Ibid.*) The defendant was a passenger in the Honda. (*Ibid.*) He was tried for the victim's murder on alternate theories as the direct perpetrator and as an aider and abettor. (*Ibid.*) The jury returned a general second degree murder verdict that, on its face, did not shed light on the theory of second degree murder relied upon by the jury. (*Id.* at p. 1204.)

The Supreme Court examined the jury instructions, which included a second degree felony-murder theory based on the predicate offense of shooting at an occupied motor vehicle. (*Chun, supra*, 45 Cal.4th at p. 1202.) In order to convict the defendant of second degree murder on that theory, the instructions required the jury to find that "the defendant had the *specific intent* to commit the underlying felony of shooting at an occupied vehicle." (*Id.* at p. 1205.) Given these instructions, the court held that "any juror who relied on the felony-murder rule necessarily found that defendant willfully shot at an occupied vehicle." (*Ibid.*)

---

mandate, or even imply, that the hypothetical apartment gunman would be liable for second degree implied malice murder under all circumstances. Where, as here, the evidence could lead a rational juror to conclude that a defendant did not have "a conscious disregard for life" (*Taylor, supra*, at p. 869), liability is not a foregone conclusion.

Turning to the evidence, the Supreme Court stated, "The undisputed evidence showed that the vehicle shot at was occupied by not one but three persons. The three were hit by multiple gunshots fired at close range from three different firearms. No juror could have found that defendant participated in the shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life—which is a valid theory of malice." (*Chun, supra,* 45 Cal.4th at p. 1205.) Because "no jur[y] could find felony murder without also finding conscious-disregard-for-life malice," any error in the second degree felony murder jury instructions was therefore harmless beyond a reasonable doubt. (*Ibid.*; see *People v. Hach* (2009) 176 Cal.App.4th 1450, 1457 [error under *Chun* harmless where defendant shot victim from 10 feet away knowing car was occupied].)

As in *Chun*, the jury here was instructed that it must find that Hansen possessed specific intent to shoot at an inhabited dwelling in order to find second degree felony murder. The jury's general second degree murder verdict demonstrates that the jury found that Hansen possessed such specific intent, i.e., that Hansen willfully shot at an inhabited dwelling. However, unlike shooting at an occupied vehicle (the offense at issue in *Chun*), shooting at an inhabited dwelling *does not* require that individuals be present in the dwelling at the time of the shooting. (§ 246 ["As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."]; see *Hansen, supra*, 9 Cal.4th at p. 310.) "A defendant may violate section 246 by discharging a firearm into an inhabited, but temporarily unoccupied dwelling. In that

26

circumstance, there is no person present to be the target of the unlawful attack and the threat of injury or risk to human health and safety is lacking." (*In re Daniel R.* (1993) 20 Cal.App.4th 239, 244.) By contrast, the act of shooting at an occupied vehicle is more likely to carry some risk of injury because at least one person must be present in an occupied vehicle. (See *People v. Ochoa* (2001) 26 Cal.4th 398, 461-462.)

The specific circumstances of the shooting here are, moreover, quite different from the facts of *Chun*. The victim in *Chun* was shot from a neighboring car, several feet away, while both cars were stopped on a public street. The victim's car was indisputably occupied. It appears that no reasonable argument could be made that the defendant in *Chun* was unaware of that fact. Here, by contrast, Hansen fired at the apartment from many feet away after knocking twice on the doors and windows and receiving no response. Unlike in *Chun*, in which there was no evidence from which a rational juror could find that the defendant did not know of the danger and did not harbor conscious disregard for life, a rational juror could have believed Hansen's testimony that he was not aware that the apartment was occupied at the time he shot into the apartment, and still convicted Hansen of second degree murder based on a legally erroneous felony-murder theory.

The decision in *Bejarano, supra*, 149 Cal.App.4th at page 979, is instructive in this context. In that case, the jury convicted the defendant of second degree murder, again without specifying its theory. The jury was presented with alternate theories of second degree murder, including implied malice and felony murder. (*Id.* at pp. 990-991.) As in *Chun*, the predicate offense was shooting at an occupied motor vehicle. (*Id.* at p.

27

990.) Predicting the result in *Chun*, the *Bejarano* court decided that this offense merged with any resulting homicide and thus could not form the basis of a second degree felony murder conviction. (*Ibid*.) In assessing the question of prejudice, the court examined the evidence presented at trial. The victim was shot once while driving in the vicinity of the defendant's home in Los Angeles. (*Id.* at p. 979.) The defendant, who was drunk at the time, gave conflicting accounts of his involvement in the shooting. (*Id.* at p. 991.) His accounts centered around a car, specifically, an Oldsmobile, that was different from the victim's car that was actually hit. The court explained, "[Defendant] admitted that he pointed his gun at the Oldsmobile's occupants and intended to shoot them. However, there was also evidence he pointed the gun at the Oldsmobile after it left and then the gun discharged. There was no evidence that he carefully aimed at the Oldsmobile's occupants when he fired. [The defendant] at one point told police he mistakenly pulled the gun's trigger and the gun *went off*. He denied pointing at the Oldsmobile and following it as it drove away." (*Id.* at p. 991.) The defendant stated that the Oldsmobile was "far" away from him when he shot, and he did not see the victim's car. (*Id.* at pp. 991-992.)

The *Bejarano* court concluded, "Given the subjective mental component of implied malice and the above recited facts, a jury reasonably could have concluded that the issue of whether [the defendant] harbored malice (express or implied) was not reasonably free from dispute. Accordingly, the jury reasonably could have convicted [the defendant] of second degree murder based on a felony-murder theory and not malice, either because convicting him on the less demanding theory of felony murder made it

28

unnecessary to reach the issue of whether appellant harbored malice, or because the jury actually entertained a reasonable doubt that he harbored malice."  (*Id.* at p. 992.)

The facts here are even more compelling than in *Bejarano*, since the jury could reasonably have determined that Hansen did not know that the apartment was occupied at the time of the shooting, as we have explained.  While ample evidence would have supported a jury finding of implied malice here, we cannot say that a contrary finding would be unreasonable.  (See *People v. Gonzales, supra*, 54 Cal.4th at p. 666.)  The prejudicial effect of the erroneous felony murder instruction is thus apparent, and a new trial is required.

3

The District Attorney further argues that *Lucero* supports a finding of harmless error here.  We disagree.  Unlike *Lucero*, where the felony-murder rule was given "short shrift at trial" and "was virtually ignored in closing arguments" (*Lucero, supra*, 200 Cal.App.4th at pp. 48, 49), the rule here was the subject of substantial instruction by the court and argument by counsel.  The jury's verdict in *Lucero* also found the defendant guilty of additional counts of attempted murder, which showed that the jury found malice as to those victims: "No juror who correctly followed the instructions could arrive at a verdict of attempted murder without addressing the question of malice aforethought and resolving it against Lucero."  (*Id.* at p. 51.)  The *Lucero* court concluded that the jury's guilt determinations on the attempted murder counts " 'leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice.' "  (*Ibid.*, quoting *Chun, supra*, 45 Cal.4th at p. 1205.)

29

Here, unlike in *Lucero*, there is nothing in the jury's verdict that shows that it made the required findings of malice that would support Hansen's second degree murder conviction on a valid theory of implied malice. The District Attorney's reliance on *Lucero* is therefore unavailing.

4

In light of our conclusion that the error was prejudicial based on the jury's verdict and evidence presented at trial, we need not address Hansen's additional arguments regarding prejudice. We note specifically that we have not relied on the juror declarations and questionnaires obtained by Hansen's trial counsel. These documents purport to reflect the jury's reasoning and mental impressions regarding their verdict. As such, they are inadmissible to impeach the jury's verdict, as Hansen seeks to do here. (See Evid. Code, § 1150; *People v. Sutter* (1982) 134 Cal.App.3d 806, 820.)

The District Attorney's failure to object to these declarations and questionnaires at Hansen's trial is of no moment. "[E]vidence that violates Evidence Code section 1150 is not merely inadmissible; it is irrelevant—'of no jural consequence.' [Citation.] Thus, the People did not have to object below to preserve this contention." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 494; see *People v. Lindberg* (2008) 45 Cal.4th 1, 53.)

30

## DISPOSITION

The order is affirmed.

_____
AARON, J.

I CONCUR:


_____
McDONALD, J.

BENKE, J., Dissenting.

I agree with the majority's conclusion that, in light of *People v. Chun* (2009) 45 Cal.4th 1172, 1198-1201 (*Chun*), the jury in this case should not have been instructed on a theory of felony murder based on Michael Hansen's alleged violation of Penal Code section 246. I am also willing to accept that Hansen is entitled to the benefit of the new rule set forth in *Chun*.

What I cannot join is the majority's determination Hansen was prejudiced by inclusion of a felony-murder instruction. My principal point of departure is the majority's application of the harmless-beyond-a-reasonable-doubt standard of review for prejudice. Although our California Supreme Court has not considered what standard to apply when, as here, we are engaged in collateral review of a final judgment, we should adopt and apply the more deferential "grave doubt" harmless error standard of review, which governs consideration of similar trial errors when found in federal habeas proceedings. (See *Chun*, *supra*, 45 Cal.4th at p. 1204.) At the very least, the majority should explain why its harmless error analysis departs from the "grave doubt" standard adopted by the United States Supreme Court in *Brecht v. Abrahamson* (1993) 507 U.S. 619 (*Brecht*) and *Kotteakos v. United States* (1946) 328 U.S. 750 (*Kotteakos*).

However, even under the stricter reasonable doubt standard, the record here shows Hansen was not prejudiced by the felony-murder theory provided to the jury. As I explain more fully, the undeniable evidence Hansen knew he was acting in a life-threatening manner, and thus with implied malice, eliminates the possibility of any

prejudice.

1. Harmless Error

As the majority note, the trial court's error in giving a felony-murder instruction was subject to harmless error analysis. (See *Chun*, *supra*, 45 Cal.4th at p. 1201.) "As the United States Supreme Court has emphasized, '"[t]he harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ('Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it')."' (*Rose v. Clark* [(1986)] 478 U.S. [570,] 577, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681; cf. *People v. Cahill* [(1993)] 5 Cal.4th [478,] 508-509 [noting similar policies underlying the reversible error rule under the California Constitution].)" (*People v. Flood* (1998) 18 Cal.4th 470, 507.) Thus, where the record shows an instructional error has nothing to do with a jury's determination of guilt or innocence, reversing a defendant's conviction will "erode the purpose and rationale of the harmless error doctrine and promote disrespect for the judicial system." (*Ibid.*)

Although it does not appear that our own California Supreme Court has addressed the issue, the United States Supreme Court has made it clear that in federal habeas proceedings, the beyond-a-reasonable-doubt harmless error standard set forth in

2

*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) does not apply to trial errors. (See *Brecht*, *supra*, 507 U.S. at p. 637; see also *O'Neal v. McAninch* (1995) 513 U.S. 432, 438-439; *California v. Roy* (1996) 519 U.S. 2, 5-6.)[1] "Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a '"reasonable possibility"' that trial error contributed to the verdict, [citation], is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously wronged.' Retrying defendants whose convictions are set aside also imposes significant 'social costs,' including the expenditure of additional time and resources for all the parties involved, the 'erosion of memory' and 'dispersion of witnesses' that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of 'society's interest in the prompt administration of justice.' [Citation.] And since there is no statute of limitations governing federal habeas, and the only laches recognized is that which affects the State's ability to defend against the claims raised on habeas, retrials following the grant of habeas relief ordinarily take place much later than do retrials following reversal on direct review. [¶] The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of

---

[1] In *People v. Flood*, *supra*, 18 Cal.4th at page 498, our Supreme Court recognized the more lenient standard of review applied in federal habeas proceedings but did not have occasion to apply it in the direct appeal before it.

3

constitutional error." (*Brecht*, at p. 637.)

Rather than the *Chapman* beyond-a-reasonable-doubt harmless error standard, the United States Supreme Court found that the "substantial and injurious effect" or "grave doubt" standard, which applies when a federal court is reviewing nonconstitutional errors in criminal cases, is more suited to collateral review. (*Brecht*, *supra*, 507 U.S. at pp. 637-638.) This more lenient standard was adopted in *Kotteakos*, *supra*, 328 U.S. at page 776 and requires reversal only when a reviewing court finds that an error had substantial influence on the jury's verdict or "is left in grave doubt" (*Kotteakos*, at pp. 764-765). Later, in *O'Neal v. McAninch*, *supra*, 513 U.S. at page 435, the court provided this amplification of the grave doubt standard: "By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."

The record here fully warrants application of the *Kotteakos* standard. Diane Rosalez was killed in 1991, and Hansen was tried in 1992. Even if Michael Echaves, Martha Almenar, Louis Miranda, Rudolfo Andrade, Alexander Maycott, and the other witnesses are still alive, time has no doubt faded all their memories of the complicated series of transactions and events that lead to Diane's death. Thus, retrial here imposes the very social costs and harm to the public's interest in the prompt administration of justice that convinced the Supreme Court the *Kotteakos* standard is more appropriate than *Chapman* in collateral proceedings as a means of determining whether an error is harmless.

4

2. Analysis

Even if we were reviewing this record on direct appeal and were required to apply the stricter standard of review for prejudice, this record, like the records considered in *Chun* and *In re Lucero* (2011) 200 Cal.App.4th 38, leaves no reasonable possibility the jury somehow found a violation of Penal Code section 246 but no implied malice.

I begin with the instructions provided to the jury. Those instructions, taken together with Hansen's conduct, virtually eliminate the possibility the jury could find felony murder without also finding implied malice. The felony-murder instruction the jury was given expressly required the prosecution to prove Hansen committed a crime that was *inherently* dangerous to human life and further instructed the jury that shooting into an inhabited dwelling *is* a felony inherently dangerous to human life. The implied malice instruction the jury was given required that the prosecution prove that Hansen intentionally committed an act dangerous to human life *with knowledge* that it was dangerous and with conscious disregard for human life.[2] The only difference between the instructions was the requirement under the implied malice instruction that the jury

---

[2]    The felony-murder and implied malice theories were given to the jury in the following form: "In order to prove such crime, each of the following elements must be proved: a human being was killed, the killing was unlawful, and the killing was done with malice aforethought or occurred during the commission or attempted commission of a felony inherently dangerous to human life. Shooting at an inhabited dwelling is a felony inherently dangerous to human life.

"'Malice' may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when: the killing result[s] from an intentional act, the natural consequences of the act are dangerous to human life and the act was deliberately performed with knowledge of the danger and with conscious disregard for human life."

5

find Hansen knew about the dangerousness of his conduct and acted with conscious disregard to human life. (See *People v. Patterson* (1989) 49 Cal.3d 615, 626; see also *Chun*, *supra*, 45 Cal.4th at p. 1181.) Thus, in order for Hansen to have been prejudiced by the felony-murder instruction the jury was given, we would have to conclude that one or more of the jurors believed that, although Hansen committed an inherently dangerous felony, he nonetheless did not know that it was dangerous or was unconscious of the threat it posed. I do not believe a juror could make such a finding, where, as here, the crime involved multiple and intentional gunshots into a lighted dwelling. Rather, I believe the record shows that while Hansen may not have intended to kill anyone, he had to be aware that the multiple gunshots he deliberately fired into the Echaves apartment were lethally dangerous and, thus, was acting with implied malice.

Consideration of the court's holding in *Chun* only confirms my conclusion. In finding that violation of Penal Code section 246 merges with any homicide so that felony murder is unavailable, the court in *Chun* did so because it found that shooting at a vehicle is an "assaultive" felony. The court in *Chun* defined an "assaultive" felony as "one that involves a threat of immediate violent injury." (*Chun*, *supra*, 45 Cal.4th at p. 1200.) While it is conceivable that a defendant could commit an assaultive crime, such as shooting into a dwelling or vehicle, and be unaware of its dangerousness, such a state of mind would be very rare. (See, e.g., *People v. Taylor* (2004) 32 Cal.4th 863, 868.) Indeed, in *Chun*, the court determined that, because the shooting there involved three victims traveling together in a car and each was hit by a bullet from a different firearm,

6

any felony-murder finding necessarily included a conscious-disregard-for-life malice finding.  (*Chun*, at p. 1205.)  The court stated, "on this evidence, no juror could find felony murder without also finding conscious-disregard-for-life malice."  (*Ibid*.)  Here, Hansen approached the apartment with the headlights of his car turned off.  A jury could not interpret this fact as anything other than an attempt to avoid detection by anyone in the apartment.  Hansen then deliberately fired multiple rounds into the apartment, where lights were still on.  Hansen's stealthy approach did not give Diane or her brother a chance to hide anywhere in the apartment and entirely undermines his contention he did not believe anyone was in the apartment when he began firing.  Unlike my colleagues, I find it difficult to believe the jury could find that, on those facts, Hansen was guilty of felony murder without also finding the conscious-disregard-for-life needed for implied malice.  Thus, as in *Chun*, I do not believe there is any possibility the felony-murder instruction prejudiced Hansen.

In sum, I have no doubt—grave, reasonable or otherwise—that Hansen acted with implied malice *and* that the jury so found.  I would reverse the trial court's order granting Hansen's petition.


BENKE, Acting P. J.

7