Filed 8/21/25  P. v. Hernandez CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C100387 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STKCRFE20090008905 & SF113661C) |
| v. | |
| ARMONDO HERNANDEZ, | |
| Defendant and Appellant. | |

In 2011, a jury found defendant Armondo Hernandez guilty of three counts of assault by means of force likely to produce great bodily injury or with a deadly weapon and one count of second degree murder.  It also found true related gang and firearm enhancements but made no finding on a gang-murder special circumstance.  The trial court sentenced defendant to 14 years and 4 months plus 40 years to life in prison.

After the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), defendant petitioned for resentencing.  The trial court denied the petition following an evidentiary hearing.

1

On appeal, defendant contends: (1) the prosecutor violated the Racial Justice Act by using animal imagery and metaphors to describe defendant and his associates in the opposition to defendant's resentencing petition and, to the extent the issue has been forfeited, defendant received ineffective assistance of counsel; (2) there is insufficient evidence to support a finding that defendant aided and abetted the killing with implied malice; (3) the trial court improperly considered the felony murder rule in its analysis; and (4) issue preclusion forecloses the trial court's finding of express malice. We reject these contentions and affirm the trial court's order. Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

We take the background facts partly from our prior opinions *People v. Hernandez* (Mar. 8, 2016, C068079) [nonpub. opn.] (*Hernandez I*) and *People v. Hernandez* (Feb. 28, 2022, C091247) [nonpub. opn.] (*Hernandez II*). We incorporate by reference the records in both appeals on our own motion.

*A.    The Trial*

Defendant, along with codefendants Roberto Arias and Martin Flores, were members of the Proud Brown Trece subset of the Sureños criminal street gang. Sureños is a rival of the Norteños criminal street gang. (*Hernandez I*, *supra*, C068079)

In December 2009, Flores encountered Norteños members Spencer Sampson and Robert Limon, as well as Sampson's sister, at a store. Flores and Sampson exchanged looks, words, and gestures that were understood as challenges in a gang context. After the exchange, Sampson and his group left.

Flores, Arias, defendant, and others met up and went looking for the Norteños who had insulted Flores at the store. While driving around, defendant, Flores, and Arias attacked two people whom they mistook for gang members. At one point during the attack, one assailant pointed a gun at one of the victims' faces while others beat the victim. (*Hernandez I*, *supra*, C068079)

2

After the attack, defendant and his group found and confronted the Sampson siblings and Limon. They circled around Sampson's sister, and Arias showed and cocked his gun. As Sampson's sister turned to warn Sampson about the gun, another person from defendant's group struck the Sampson sister in the ear, starting a fight. Flores and defendant fought Limon while Arias shot and killed Spencer Sampson. (*Hernandez I*, *supra*, C068079.)

Limon saw the group travel in a Ford Probe. Another witness saw defendant drive away with Arias and Flores in a two-door Ford on the night of the attack, and two others knew that defendant owned a red two-door car at the time. The next day, the police stopped defendant while he was driving a red Ford Probe.

A gang expert explained that a gang member is "caught slipping" when the member accidentally encounters and is challenged by rival gang members while alone. After being "caught slipping," it is common for the gang member to gather other gang members and retaliate against the rival. And if gang members feel disrespected by someone, they will either assault or kill that person. In the expert's opinion, Flores was "caught slipping" by Sampson and his group at the store.

The People charged defendant with three counts of assault by means of force likely to produce great bodily injury or with a deadly weapon (former § 245, subd. (a)(1), counts 7, 8, 11) and one count of willful, deliberate, and premeditated murder. The People alleged that defendant committed these counts for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). As for the murder count, the People also alleged (1) a principal discharged a firearm, proximately killing Sampson (§ 12022.53, subds. (d) & (e)(1)), and (2) the special circumstance that the murder was committed by defendant as an active participant in a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)).

The trial court instructed the jury that, to prove defendant guilty of murder, the prosecutor must establish defendant acted with express or implied malice. Express

3

malice is the "unlawful[] inten[t] to kill." If the jury found defendant committed murder, it must then decide whether the murder was in the first or the second degree. First degree murder requires the prosecutor to prove that defendant acted willfully, deliberately, and with premeditation. The trial court told the jury that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated" and "if you find it's murder, but you have a reasonable doubt that it's first degree, then you'd have to say it's second degree."

The jury found defendant guilty of all three assault counts and murder in the second degree. It also found true the related gang and firearm enhancements. But the jury left blank the gang-murder special circumstance verdict form, which stated it was to be used only upon a first degree murder guilty finding.

The trial court sentenced defendant to state prison for 14 years and 4 months on the assault counts plus a consecutive term of 40 years to life on the murder count.

B.    *The Resentencing Petition*

After the enactment of Senate Bill 1437, defendant filed a section 1172.6 petition for resentencing, alleging he was prosecuted for and convicted of murder under the natural and probable consequence doctrine and could not now be convicted of murder following Senate Bill 1437. We previously reversed the trial court's order denying defendant's petition. (*Hernandez II*, *supra*, C091247.) Following a new evidentiary hearing on remand, the trial court again denied the petition.

Defendant timely appeals.

DISCUSSION

I

*Racial Justice Act*

Defendant contends the prosecutor violated the Racial Justice Act by using animal imagery and metaphors to describe defendant's offenses in the opposition to defendant's section 1172.6 resentencing petition. To the extent this claim has been forfeited,

4

defendant asserts he received ineffective assistance of counsel. We conclude defendant has forfeited his claim by failing to raise it below, and we find no ineffective assistance of counsel.

## A.     Additional Background

During his interview with a detective about the incident, defendant claimed some of his friends call him Lobo. At trial, a witness identified defendant as El Lobo and stated he did not know defendant's real name. In later parts of the witness's testimony, both the prosecutor and the witness referred to defendant as Lobo. Defendant's number was also stored in Flores's phone as Lobo. The prosecution's gang expert testified that "most gangs and gang members go in packs." Defendant asserts on appeal that "Lobo" means "wolf" in Spanish.

The prosecutor's opposition to defendant's resentencing petition described the offenses in pertinent part: "After picking up Flores, the pack searched for victim Sampson. Unfortunately, the pack attacked [two people], apparently mistaking them for Sampson's group. Back on the prowl, [defendant] and his pack found victim Sampson with Limon and [Sampson's sister] and then the pack attacked. Bystanders . . . both testified that the shooter fired his weapon right after one of his companions started the altercation. . . . [Defendant] and his pack then scurried away. [¶] . . . [Defendant] and his pack, including Flores, found and assaulted [two people] near the [store], where Spencer Sampson had disrespected Flores. . . . After [one of the victims] convinced the pack that he was not a gang member, the pack left to look for Sampson's group. . . . [¶] . . . During the assault on [one of the victims], [defendant]'s pack repeatedly asked whether he was a gang member . . . . [Defendant], also a Sureño, was roaming and hunting with Arias on the night of the murder. . . . Yet, [defendant] continued the hunt for Sampson . . . . When [defendant]'s pack found and confronted Sampson's group, the gunman flashed a firearm before the fight even began." The prosecutor summarized: " 'Lobo' led his pack on

5

multiple missions." Defendant made no Racial Justice Act objections either in his response or at the evidentiary hearing.

B.    *Forfeiture*

Under the Racial Justice Act, the state "shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) A defendant establishes a violation of the Racial Justice Act if he proves, by a preponderance of evidence, that "[d]uring the defendant's trial, in court and during the proceedings, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin . . . whether or not purposeful." (§ 745, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including . . . language that compares the defendant to an animal." (§ 745, subd. (h)(4).) But the use of discriminatory language does not violate the Racial Justice Act "if the person speaking is relating language used by another that is relevant to the case." (§ 745, subd. (a)(2).)

"[A] section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 812; accord, *People v. Corbi* (2024) 106 Cal.App.5th 25, 43; *People v. Singh* (2024) 103 Cal.App.5th 76, 114; see § 745, subd. (c) ["A motion that is not timely may be deemed waived, in the discretion of the court"].)

Here, defendant argues the prosecutor discriminately cast him as "a 'big bad' wolf" by referencing him as "Lobo" and reinforced the animalistic qualities by using terms such as "hunting," "roaming," "attacking," and "scurrying" to describe his offenses. But defendant made no Racial Justice Act objections below. He has forfeited his Racial Justice Act claim.

We reject defendant's contention that this appeal presents a pure question of law. Defendant was known as "Lobo" in his close circle. One of the witnesses in defendant's

6

circle did not even know defendant's real name. The gang expert also testified that gang members tend to "go in packs." Given the trial testimonies, it was possible that the prosecutor was relating to language used at trial when he used "Lobo" and "pack" in the opposition. The other terms defendant raises concerns about are also commonly used in reference to human behavior. (See *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1078 [the prosecutor's use of "predator" and "prey" did not appeal to racial bias because these terms are commonly used in reference to human behavior].) Thus, deciding whether the prosecutor used racially discriminatory language or whether such language appeals to racial bias "necessarily requires reference to and consideration of the circumstances of the case and record below." (*People v. Singh*, *supra*, 103 Cal.App.5th at p. 116; accord *People v. Lashon*, *supra*, 98 Cal.App.5th at p. 816.) Moreover, it would not be procedurally efficient to find an exception to the forfeiture rule here when the trial court could have easily remedied the alleged bias by disregarding the improper language upon a timely objection. (*Singh*, at p. 116.)

Defendant also contends that the forfeiture rule should not apply because "there are no post-hearing chances for remedying violations of" the Racial Justice Act in a section 1172.6 proceeding. We are not persuaded. "[U]nless a party makes a contemporaneous objection, he or she generally cannot challenge a court's ruling for the first time on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 594.) Defendant cites no authority stating otherwise.

C.      *Ineffective Assistance of Counsel*

The burden of proving ineffective assistance of counsel is on the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To establish constitutionally inadequate representation, the defendant must show that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. (*Ibid.*)

We defer to trial counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) On

direct appeal, "competency is presumed unless the record affirmatively excludes a rational basis for the trial attorney's choice." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Gray* (2005) 37 Cal.4th 168, 207.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

Here, the record sheds no light on why trial counsel failed to object to the prosecutor's use of animal imagery and metaphors. But a satisfactory explanation exists. Trial counsel could have decided an objection would be meritless because the animal imagery and metaphors were either language used by other witnesses at trial or terms that are also commonly used to describe human behavior. (*People v. Kipp* (1998) 18 Cal.4th 349, 377 [failure to assert a meritless position does not demonstrate ineffective assistance of counsel].)

Having reached this conclusion, we need not decide whether the Racial Justice Act applies to section 1172.6 proceedings.

II

*Resentencing*

Defendant contends the trial court erred in denying his petition for resentencing because: (1) the trial court mistakenly considered the felony murder rule which is inapplicable to this case; (2) issue preclusion forecloses a finding of express malice; and (3) there is insufficient evidence to support a finding that defendant personally harbored the requisite malice for aiding and abetting implied malice murder under the current murder laws. We disagree.

8

*A.     Trial Court Findings*

At the evidentiary hearing on remand, the trial court stated it "must decide if the defendant is guilty beyond a reasonable doubt of murder as of the law on January 1, 2019." It then revisited portions of the trial transcript and summarized the events leading to Sampson's killing. In the trial court's summary, it noted defendant was aware that Arias was armed and intended to kill Sampson, but he remained with Arias and Flores through both assaults. After summarizing the trial evidence, the trial court denied defendant's petition, finding him guilty beyond a reasonable doubt for aiding and abetting the murder of Sampson with the intent to kill.

*B.     Substantial Evidence of Implied Malice*

Senate Bill 1437 amended, among other things, section 188 to provide that except in felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Malice may be express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) "This change 'bars a conviction for first or second degree murder under a natural and probable consequences theory.' " (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*).)[1]

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. [Pen. Code, § 31.] Aiding and abetting is not a separate offense but a form

---

[1] Under the natural and probable consequences theory, an aider and abettor is guilty not only of the intended crime but also of any other crime a principal in the intended crime actually commits that is the natural and probable consequence of the intended crime. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901.)

9

of derivative liability for the underlying crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) "Notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, at p. 850.) "In other words, Senate Bill 1437 had no impact on accomplice liability for murder under direct aiding and abetting principles. [Citation.] An accomplice who directly aids and abets the perpetrator in committing murder is liable for murder under the new law just as he or she was liable under the old law." (*People v. Lopez* (2024) 99 Cal.App.5th 1242, 1248.)

"[A] defendant may directly aid and abet an implied malice murder." (*Reyes*, *supra*, 14 Cal.5th at p. 990.) " '[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Id.* at p. 991.)

Senate Bill 1437 also enacted section 1172.6 which provides a special procedural mechanism for those convicted under the former law to seek retroactive relief. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) The prosecution bears the burden to prove at a section 1172.6 evidentiary hearing that the petitioner is guilty of murder beyond a reasonable doubt under the amended law. (§ 1172.6, subd. (d)(3).)

We review a trial court's denial of a section 1172.6 petition for substantial evidence. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "Under this standard, we review the record ' " ' "in the light most favorable to the judgment below to determine whether it

10

discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)

Here, substantial evidence supports the trial court's finding. Defendant knowingly participated in the retaliation against Sampson after Sampson disrespected Flores. As a gang member, defendant should have known that the retaliation could involve killing Sampson. Indeed, during the assault on the two victims whom defendant and his group mistook for Norteños members, Arias pointed a gun at one of the victims' faces. It was thus clear to defendant that Arias had a gun and was ready to use it once they found Sampson. But he continued to help Arias and Flores in their search for Sampson. When the group found Sampson and his companions, they circled Sampson's sister as Arias cocked his gun. Knowing Arias got his gun ready to shoot, defendant attacked Limon, making him unable to defend Sampson.

The jury could reasonably infer from the evidence that defendant drove Arias and Flores around in search of Sampson. Limon saw defendant and his group travel in a red Ford Probe, another witness saw defendant drive Arias and Flores in a two-door Ford that same night, and several more testified that defendant owned a red Ford at the time. When the police stopped defendant the next day, defendant was driving a red Ford Probe.

Thus, substantial evidence shows defendant aided and abetted Arias's shooting of Sampson by helping Arias locate Sampson despite knowing Arias was ready to attack Sampson with a gun and by preventing Limon from assisting Sampson in the fight against Arias.

Defendant's reliance on *Reyes* is misplaced. The defendant there biked to a rival gang territory with his fellow gang members, chasing after a car. (*Reyes*, 14 Cal.5th at p. 985.) When the car turned around and drove past them, a gunshot was fired, killing the

11

driver. (*Ibid.*) Our Supreme Court found the defendant's acts of bicycling into rival territory and chasing after the car "were too attenuated in the chain of events to have proximately caused the killing." (*Id.* at p. 989.) But the causal link between defendant's conduct and Sampson's death is much stronger. Defendant helped Arias search for Sampson knowing Arias sought revenge against Sampson and was ready to use a gun. When they found Sampson, defendant attacked Limon so he could not defend Sampson. These acts proximately caused Sampson's killing.

## C. *The Trial Court's Analysis*

Defendant contends the trial court mistakenly considered the felony murder rule in its analysis because the trial court noted defendant was aware that Arias was armed and that defendant stayed with the group after the first assault. We reject this contention after an independent review. (*Reyes, supra*, 14 Cal.5th at p. 988.) It is well settled that a defendant's "presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted" in the commission of a murder. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443.) The trial court here was merely recounting the circumstances relevant to defendant's aider and abettor liability, not applying the felony murder theory.

## D. *Issue Preclusion*

The doctrine of issue preclusion applies only if several threshold requirements are met. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former

proceeding." (*Ibid.*) The party asserting issue preclusion bears the burden of establishing these requirements. (*Ibid.*)

"Senate Bill 1437 does not itself support an equitable exception to issue preclusion. To the contrary, issue preclusion will 'ordinarily' apply in such proceedings." (*People v. Curiel* (2023) 15 Cal.5th 433, 460.)

Here, the jury could find defendant acted with express malice by finding him guilty of second degree murder. As the trial court correctly instructed, express malice may be an element of second degree murder. (*People v. Gudiel* (2024) 107 Cal.App.5th 848, 859.) Defendant argues the jury necessarily found no express malice when it returned a verdict for second degree murder but made no finding on the special circumstance, which requires an intent to kill. But the jury left the special circumstance verdict form blank because it rejected murder in the first degree. And by doing so, it found the lack of willfulness, premeditation, and deliberation, not the lack of intent to kill. "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder." (*People v. Hansen* (1994) 9 Cal.4th 300, 307, overruled on another ground by *People v. Chun* (2009) 45 Cal.4th 1172.)

## DISPOSITION

The order is affirmed.

/s/
MESIWALA, J.

We concur:

/s/
EARL, P. J.

/s/
KRAUSE, J.

14